## The Enfield Toll Bridge Company *against* The Hartford and New-Haven Rail-Road Company.

A grant, by the legislature, in consideration of expenses to be incurred by the grantees, and in contemplation of a public benefit, of the exclusive right of erecting a bridge, and taking tolls, to reimburse such expenses, within certain limits, for a limited time, is not a *monopoly*, in the odious sense of that term.

Such a grant is in the nature of a contract, which may not be impaired.

The court will give to its stipulations such construction as will carry them into full effect.

In 1798, the General Assembly of this state created a corporation, for the purpose of erecting and maintaining a bridge across *Connecticut* river between *Enfield* and *Suffield*, and granted to such corporation the right of taking certain tolls from persons going over or using the bridge, for the term of one hundred years, or until the cost of erecting the bridge should be reimbursed; and then provided, that during said term of one hundred years, *no person or*

persons, should have liberty to erect another bridge any where between the *North* line of said *Enfield* and the *South* line of *Windsor*. In 1835, the General Assembly created another corporation, with power to construct a rail-road from the city of *Hartford*, by the most direct and feasible route, to the *Northern* line of this state, and thence to *Springfield*. In the charter of this corporation, it was provided, that if it should become necessary to erect a bridge across *Connecticut* river, it should be used exclusively for the rail-road travel, and it should not be lawful for the corporation to permit any other passing thereon. It was also provided in this charter, that nothing therein contained should be construed to prejudice or impair any of the rights then vested in the *Enfield Bridge Company*. The bridge company have complied with the requirements of their charter; they are in the exercise of the rights thereby granted, which have a pecuniary value; and the cost of erecting the bridge has not been reimbursed. This bridge, however, is not so constructed or situated, as to answer the purpose of a rail-road crossing. The rail-road company laid out the route of their road, with the approbation of the commissioners thereon, across the *Connecticut* river, in the most direct and feasible route from *Hartford* to the *North* line of the state and thence to *Springfield*, between the *North* line of *Enfield* and the *South* line of *Windsor*; and were proceeding to erect a structure over *Connecticut* river, at that place, for the purposes of their rail-road, and for such purposes only, claiming the right so to do, under the provisions of their charter, without making compensation to the bridge company. At this juncture, the bridge company brought a bill in chancery against the rail-road company, praying for an injunction, or other relief. During the pendency of this bill, the defendants completed said structure, and used it for the transportation of locomotives and cars, with passengers and freight. The plaintiffs then filed a supplemental bill, shewing these facts, and praying the same relief as in their original bill. The structure in question is built much in the manner common to rail-road bridges, and is adapted to and convenient for the passing of locomotives and cars, but not of common vehicles; though foot passengers, when upon the rail-road, can walk over it, in the day-time; but there is no public road or highway thereto, except said rail-road. The plaintiffs have purchased and now own the land on each side of the river, where this structure is. This is above tide water; but the river is there navigable for small flat-bottomed steam-boats, and other boats of small draft. The erection and use of said structure, by the defendants, will have a tendency, in some degree, to divert the travel from the plaintiffs' bridge; but very little, however, if any, more, than it would, if it were placed a little above or below the protected part of the river. Held, 1. that the structure of the defendants, is "a bridge," and "another bridge," within the meaning of the plaintiffs' charter: 2. that the erection and use of such bridge, by the defendants, without compensation to the plaintiffs, was a violation of their grant; and if the charter of the defendants purported to authorize such acts, it was, so far, unconstitutional and void, as impairing the obligation of a contract: 3. that a rail-road, though granted to a private company, is "for public use," within the meaning of the constitution; and the taking of private property for that use, ought to be accompanied with compensation; 4. that the franchise of a toll bridge company, is "private property," within the meaning of the constitution; and a legislative provision, authorizing an injury to such franchise, for public use, upon compensation made, is not unconstitutional: 5. that the

*Hartford,*
June, 1845.

The Enfield
Toll Bridge
Company
*v.*
The Hartford
and New-Ha-
ven Rail-Road
Company.

*Hartford*,
June, 1845.

The Enfield
Toll Bridge
Company
*v.*
The Hartford
and New-Ha-
ven Rail Road
Company.

acts of the defendants, in this case, were not authorized, by the facts, that the site of their bridge was above tide water, and that they owned the land on both sides of the river: 6. that these acts could not be vindicated, on the ground that the bridge of the defendants was exclusively adapted to, and used for, the passage of their engines and cars: 7. nor on the ground, that there was no appreciable damage resulting therefrom to the plaintiffs: 8. that though the court cannot now restrain the defendants from building the bridge, according to the specific prayer of the original bill, yet it will, under the general prayer, pass a decree in favour of the plaintiffs, affording relief adapted to the whole case.

THIS was a bill in chancery, brought to the superior court, at its term in *January* 1844, stating, that the General Assembly of this state, at its session in *October* 1798, incorporated the plaintiffs, and empowered them to erect a bridge across *Connecticut* river between the towns of *Enfield* and *Suffield*, and to collect of all persons passing over or using said bridge certain tolls; [specifying them;] which tolls the company were authorized to collect, for their own use and benefit, for the term of one hundred years, or until the expenditures of the company for the construction of the bridge should be reimbursed, with an interest of twelve *per cent*; and it was further provided, by their act of incorporation, that the company should maintain the bridge and keep it in good repair, during said term of one hundred years, subject to the inspection of the General Assembly; and that no person or persons should have liberty to build another bridge, between the *North* line of *Enfield* and the *South* line of *Windsor*, across said river; that the company were organized under their charter; that they built and finished a bridge, at the place, in the manner and within the time, prescribed by the General Assembly; that this bridge having been carried away by the ice, they rebuilt it upon the same site, and complied with all the duties incumbent upon them; that in the erection and maintenance of these bridges, they expended the sum of 60,000 dollars, and their franchise is of the value of 50,000 dollars; that the last bridge by them erected, is now standing and in good repair, and they are constantly receiving tolls from all persons passing over the same, as authorized by their charter, and are in the full possession of their exclusive right to build a bridge within their specified limits; that the defendants have commenced the construction of a rail-road from the city of *Hartford* to the *North* line of the state of *Con-*

*necticut*, which has been located, by the commissioners thereon, so as to cross the *Connecticut* river between the towns of *Enfield* and *Suffield*, by means of a bridge to be there constructed across that river, between the *North* line of *Enfield* and the *South* line of *Windsor*, and about one mile below the plaintiffs' bridge, contrary to the provisions of their charter; that the defendants have declared their design and intention to construct a bridge across *Connecticut* river, at the place specified, for the transportation of persons and property across said river, and they threaten forthwith to proceed there to construct the same, and are preparing materials for that purpose, and have so located their road as to pass *Connecticut* river at that place; that the acts of the General Assembly, by authority of which the defendants claim a right to erect a bridge across *Connecticut* river between the *North* line of *Enfield* and the south line of *Windsor*, provide no compensation for the property and franchise of the plaintiffs, and the defendants have offered no compensation therefor; and that by the erection of said bridge by the defendants, a great portion of the travel and transportation that would otherwise pass over the bridge of the plaintiffs, will be diverted therefrom, and will pass over the contemplated bridge of the defendants, whereby the plaintiffs will be greatly damnified and injured: praying, that the defendants, their agents &c. be restrained from proceeding to erect their bridge at any place between the *North* line of *Enfield* and the *South* line of *Windsor*, or for other relief.

At a term of the superior court in *April* 1844, the defendants filed a cross-bill, containing allegations as to the cost of the plaintiffs' bridge, the amount thereof obtained by grant from the state, the expense of repairs thereon, the annual expenses and income thereof, with some other matters, and praying for a discovery.

The plaintiffs, at the same term, made answer to the cross-bill of the defendants. The cause was thereupon continued until *June* 1844, when there was a hearing upon the bill and cross-bill, in connexion with the plaintiffs' answer, before the superior court.

The court found the following facts. The plaintiffs and the defendants were duly incorporated, by the legislature of this state; and their respective charters have been, from time

*Hartford*
June, 1845.

The Enfield
Toll Bridge
Company
*v*
The Hartford
and New-Haven Rail-Road
Company.

*Hartford*
June, 1845.

The Enfield
Toll Bridge
Company
*v.*
The Hartford
and New-Ha-
ven Rail-Road
Company.

to time, modified, by sundry resolves of the legislature; (*a*) which charters and resolves were embraced in the finding; but it is not necessary to detail their provisions here, except the 16th and 19th sections of the charter of *The Hartford and Springfield Rail-Road Company*, and the resolve of 1839. Of the former the following is a transcript: " Sect. 16. That should it become necessary to erect a bridge across *Connecticut* river, said company are hereby authorized and empowered to erect said bridge for the sole and exclusive accommodation of the travel on said rail-road, and it shall not be lawful for said company to permit the passing of said bridge by carriages of any description other than those which are adapted to the travelling on said rail-road ; nor by horses not attached to said rail-road carriages, nor by persons on foot, nor for any other travel whatever, except for such persons, carriages or horses, as may be employed in the immediate service of said company."

" Sect. 19. It is hereby provided, that nothing herein contained shall be construed to prejudice or impair any of the rights now vested in the *Enfield Bridge Company."*    *Priv. Stat.* 1009, 10.

By the resolve of 1839, which was passed on the application of the plaintiffs, with the knowledge and consent of the defendants, it was provided, that the plaintiffs " be authorized to appropriate a part of the *Enfield* bridge to the uses of the *Hartford and Springfield Rail-Road Company*, or to enlarge the same, or to erect another bridge for the use of said rail-road company, within the exclusive limits of the said bridge company, and to receive the same tolls from all persons crossing the same, as are allowed by the terms of their original charter: provided, that nothing herein contained shall impose any obligation upon said rail-road company, or any charge upon the persons or property transported upon said rail-road, or shall in any way affect the rights of said rail-road company under their charter."

These corporations were duly organized, shortly after the granting of their respective charters, have complied with the

(*a*) See the original charter of the plaintiffs, with additional acts. *Priv. Stat.* 249—252; of *The Hartford and New-Haven Rail-Road Company—Id.* 1002—1006; of *The Hartford and Springfield Rail-Road Company—Id.* 1006—1010; and the amendment thereto passed in 1842.

provisions thereof, and are now in the possession and exercise of the rights and franchises granted them by the legislature.

*Hartford,*
June, 1845.

The Enfield
Toll Bridge
Company
*v.*
The Hartford
and New-Ha-
ven Rail-Road
Company.

The bridge of the plaintiffs is now, and for many years has been, standing, and is in sufficient repair for ordinary travel; and the plaintiffs are now receiving, and for many years have been accustomed to receive, the tolls specified in their charter, from persons using their bridge.

Their bridge and franchise exceed in value the sum of 5000 dollars. This value is independent of any power which the plaintiffs may have of depriving the defendants of a feasible route for their line of road. The annual receipts of the plaintiffs from the bridge, from the time of its original construction, has not yielded an income of six *per cent. per annum* upon its cost, after deducting the annual expenses thereof.

The defendants are engaged in the construction of their rail-road from *Hartford* to *Springfield*, and, with the approbation of the commissioners thereon, have laid out the route thereof across the *Connecticut* river, in the most direct and feasible route from *Hartford* to the *North* line of the state and thence to *Springfield*, about one mile and an half below the bridge of the plaintiffs, and between the *North* line of *Enfield* and the *South* line of *Windsor ;* and the defendants are about to construct a bridge over the river, at that place, for the purposes of their rail-road, and for such purposes only, and not adapted to or susceptible of any other kind of travel than that by rail-road cars.

The defendants claim the right to erect this structure, by virtue of the provisions in their charter and the amendments thereto, without compensation to the plaintiffs; and they have not made any such compensation. The erection and use thereof for the business of the defendants, will have a tendency, in some degree, to divert the travel from the plaintiffs' bridge; but very little, however, if any more, than a rail-road from *Hartford* to *Springfield*, with a crossing at any other point between *Hartford* bridge and the *North* line of *Enfield*, would do.

The bridge of the plaintiffs was built to accommodate the several kinds of travel enumerated in their charter [the ordinary travel on toll bridges and turnpike roads] for which alone they are authorized to receive tolls; and it has always

*Hartford*
June, 1845.

The Enfield
Toll Bridge
Company
*v.*
The Hartford
and New-Ha-
ven Rail-Road
Company.

accommodated all the travel that has hitherto had occasion to pass the river at that place. It is not, and never was, in its structure, adapted to or fit for a rail-road crossing, but is, and always has been, wholly insufficient for that purpose; and it would be very dangerous to attempt to pass upon it, with a locomotive engine, or a train of cars. It is constructed so low, and so situated in reference to the direction of said rail-road, the river banks and the adjacent country, that a line of rail-road cannot be located to come to and cross the river, at any reasonable expense, in the line of the bridge. A new bridge will be necessary, if the road of the defendants should cross the river at the *Enfield* bridge ; and the crossing of the river at that place, though not entirely impracticable, would be attended with much greater expense than the expense of crossing at the place designated by the commissioners, and so much greater, as, in the opinion of the court, not to be reasonable ; but, at a heavy additional expense, said road might be made to cross the river at *Enfield* bridge, or at some point not embraced between the *North* line of *Enfield* and the *South* line of *Windsor ;* and then, only with such curves as to render the travel upon it dangerous, unless at very great additional expense to the defendants. They have purchased, and now own, the land on each side of the river, at the points between which they contemplate the construction of the proposed crossing.

The charter of *The Hartford and Springfield Rail-Road Company*, was incorporated with, and became a part of, the charter of the *Hartford and New-Haven Rail-Road Company ;* and there was never any organization under the former, except in this way.

*Connecticut* river is navigable for flat-bottomed small steamboats, and other boats of small draft, for passengers and freight, above tide water.

The plaintiffs have no right to take any other tolls than such as are provided for by their charter and the amendments thereto ; and the defendants never had, nor have they now, any intention or purpose to construct a bridge or crossing over *Connecticut* river within the limits specified in the plaintiffs' charter, or to erect a structure of any kind to be used as a bridge, by any person or persons, of whom the plaintiffs have any right to take toll, unless the plaintiffs, upon a just

*Hartford June, 1845.*

The Enfield Toll Bridge Company *v.* The Hartford and New-Haven Rail-Road Company.

construction of their charter, are entitled to exact tolls of the defendants, for the accommodation of their cars with passengers in crossing the river, or of the passengers in the cars; nor are the defendants engaged in erecting or constructing any work, except such as is necessary for a rail-road crossing over the river, for the exclusive accommodation of rail-road vehicles upon their rail-road; there being no mode of crossing the river with locomotives or cars, except such as is provided and constructed by the defendants, who have located their rail-road over the river, in a line, which the plaintiffs never have occupied by a bridge, and which there was no evidence to show that they ever intend so to occupy.

The superior court reserved the question as to what decree should be passed, or what disposition should be made of the case, for the advice of this court, at its term then next to be holden in *Hartford* county, *viz.* in *June* 1844. The case was entered in the docket of that term, and was continued, without argument, to the term in *June* 1845.

In the meantime, *viz.* in *January* 1845, the plaintiffs brought a supplemental bill in the superior court, alleging, that after the continuance of the case in this court, the defendants proceeded to erect and finish their bridge, at the place before mentioned between the *North* line of *Enfield* and the *South* line of *Windsor;* and that they are now constantly using it for the transportation of locomotives and rail-road cars, and also for the transportation of travellers, in said cars and on foot, and for the transportation of freight; praying, as in the original bill, for an injunction or other relief. To this supplemental bill there was a special demurrer; which was overruled, *pro forma,* that the case might be presented entire; and the court thereupon proceeded to enquire into the facts alleged, and found them as follows.

The defendants have gone on and completed the bridge which was contemplated under their charter, as found by the court, at its sitting in *June,* 1844; and since the 9th of *December* last, the defendants have been constantly using such bridge for the transportation of locomotives and rail-road cars, and of travellers and freight in those cars; and great numbers of persons and great quantities of freight are constantly transported, in said cars, over said bridge. It is built much in the manner common to rail-road bridges. The

*Hartford*
June, 1845.

The Enfield
Toll Bridge
Company
*v.*
The Hartford
and New-Ha-
ven Rail-Road
Company.

bottom is covered with plank, and the sides secured by railing about two and a half feet in height. That part of the bridge over which the rails are laid, is covered over the plank with sheet-iron, laid curving or dishing, so that the top of the ridge above the centre of the curve is about two and a half inches above the lower part thereof, and the space between the ridges is about 18 inches. The space between the iron railings and the side railing over the plank, is covered by sheets of tin, secured together by clamping, somewhat after the manner of securing the roofs of houses, by tin sheets somewhat inclined, so that the water should run off and not injure the road below. The height of these ridges is about three fourths of an inch above the flat part of the tin, and the ridges are about nine inches apart. Foot passengers might, without much difficulty, walk over the bridge between these ridges, in the day-time, but not without danger of injury to this metal covering. The bridge is constructed in a convenient manner for the locomotives and rail-cars to pass. Foot people can also have convenient access to it, when upon the rail-road ; but there is no public road or highway thereto, except said rail-road ; and since said bridge was finished, public notice has been posted up thereon, that crossing thereon is by law prohibited.

No evidence was given that the bridge had been passed by any one, before the commencement of this suit, on the 16th of *January* 1845, except by those engaged in its erection, but in a single instance, and this by a person employed on the road in *Massachusetts,* who, before it was planked, walked over upon the trusses.

Evidence was given, subject to objections, that since that time, and before the iron and tin plates were laid, several persons had crossed over, from time to time, as matter of convenience, when the ferry was obstructed. But there was no evidence that this was by permission of the defendants, or their agents ; or that it had been done since the bridge was completed, by the iron and tin plates.

The questions arising upon this record and finding were reserved for the consideration of the supreme court of errors, *viz.*

1. Whether the plaintiffs' bill is sufficient under the special demurrer.

2. Whether the evidence objected to should have been admitted.

3. What decree shall be made in the case, upon evidence properly admitted,—or in what manner the bill shall be disposed of, by the superior court.

Hartford,
June, 1845.

The Enfield
Toll Bridge
Company
v.
The Hartford
and New-Haven Rail-Road
Company.

*W. W. Ellsworth* and *Toucey,* for the plaintiffs, contended, 1. That the legislature intended to grant to the plaintiffs the *exclusive* right of transporting over *Connecticut* river, upon a bridge, all the persons, and all the animals and the freight specified in the charter, within the specified limits. *Charles River Bridge* v. *Warren Bridge,* 7 *Pick.* 465. *per Morton, J. S. C.* in the supreme court of the *United States,* 11 *Pet.* 560. *The Cayuga Bridge Company* v. *Magee & al.* 6 *Wend.* 85. 94. *Id.* v. *Stout,* 7 *Cowen* 33.

2. That the legislature had the *power* to make this grant. The power of directing and regulating bridges and ferries over navigable streams, below or above tide water, has always been exercised, by the legislature, not only in this state, but in *England* and in all the states of the *Union. Adams* v. *Pease,* 2 *Conn. R.* 484. *Enfield Toll Bridge Company* v. *The Connecticut River Company,* 7 *Conn. R.* 28. *The Hartford Bridge Company* v. *East Hartford,* 16 *Conn. R.* 149. [Several cases decided in other states, were also referred to.]

*Connecticut* river is a public highway, not only up and down, but across it; and the public authority may regulate it. The defendants cannot deny this power; for their defence is founded on the exercise of a similar power, in regard to the same stream, at the same place. The resolve of 1839 recognizes the plaintiffs' right, and limits the grant of the defendants.

3. That the acts of the defendants are a violation of the plaintiffs' right. In the first place, the structure of the defendants is " a bridge," within the meaning of the plaintiffs' charter. It is such *literally,* answering precisely to the definition of a bridge. *Web. Dict.* in verb. It is such also in its *design,* answering the purposes of a bridge, *viz.* the transportation of passengers and freight. Surely it is not less a bridge, nor less injurious to the plaintiffs, because it is fitted to transport *more* passengers and freight than ordinary bridges.

*Hartford,*
*June, 1845.*

The Enfield
Toll Bridge
Company
*v.*
The Hartford
and New-Ha-
ven Rail-Road
Company.

The objection that the legislature, at the time of the plaintiffs' grant, could not have contemplated such a structure as that of the defendants, because rail-roads were then unknown, is of no avail. The fact is otherwise. They were in use as early as the sixteenth century. They were made of iron in 1767; and the edge rail was introduced in 1789. No material improvement has since been made. 16 *Edin. Encyc.* 304. But if no member of our General Assembly, in 1798, had ever heard of a rail-road, it would make no difference. They knew what travel over *Connecticut* river was; and they meant to secure to the plaintiffs the exclusive benefit of that travel, within the designated lines; and whether it passed in coaches and wagons, or in cars, is unimportant.

That the plaintiffs' bridge will not accommodate the defendants, is nothing to the point in controversy. Are the plaintiffs bound to furnish the means of injuring themselves?

4. That the legislature has never authorized the defendants, or made a grant purporting to authorize them, to build a bridge within the protected limits. The charter of the *Hartford and Springfield Rail-Road Company*, saves the rights of the plaintiffs, instead of granting a conflicting right. The object of the resolve of 1839, passed with the consent of all parties, was to *enlarge* the franchise of the plaintiffs. The saving therein of the rights of the defendants, did not confer on them, or recognize in them, a right to build a rail-road bridge, within the protected limits. All the rights granted by the act of 1842, were subject, by express provision, to previous enactments.

5. That the erection and use of the defendants' bridge, has produced, and will continue to produce, injury to the plaintiffs. That this must necessarily be the result, is evident from the nature of the case. But here, the fact of a diversion of tolls, is found.

6. That the proper remedy is, a decree restraining the defendants from further injury, by the use of their bridge. Equity interferes by injunction to protect a statute privilege, when the party is in possession, whatever may be the injury. *Livingston & al.* v. *Van Ingen & al.* 9 *Johns. R.* 507. *The Croton Turnpike Company* v. *Ryder & al.* 1 *Johns. Ch. R.* 611. *The Newburgh Turnpike Company* v. *Miller & al.* 5 *Johns. Ch. R.* 101. *Ogden* v. *Gibbons,* 4 *Johns. Ch.*

*R. 150. The Enfield Toll Bridge Company* v. *The Connecticut River Company, 7 Conn. R. 50, 51. per Hosmer, Ch. J.* Here, the right of the plaintiffs, derived from a statute grant, their possession, and the facts generally, are admitted. There are many reasons in favour of the remedy by injunction. Prevention is always better than cure. The injury, from its nature, is not susceptible of exact ascertainment. The defendants may be irresponsible. A multiplicity of suits is avoided.

7. That if the court will not grant an injunction, it will, under the general prayer in the bill, pass a decree in favour of the plaintiffs, adapting the relief to the nature of the case.

*Hungerford* and *Hitchcock,* (a) for the defendants, contended, 1. That allowing that the General Assembly had the constitutional right to prohibit the erection of another bridge within the limits specified in the plaintiffs' charter, yet it

*Hartford, June, 1845.*

The Enfield Toll Bridge Company v. The Hartford and New-Haven Rail-Road Company.

(a) This was the last case argued by Mr. *Hitchcock* in this court. I had collected some facts and dates for a biographical notice of him, to be inserted here; but I have since met with one, embracing the same facts and dates, already prepared, which I am happy to avail myself of, for this purpose. It is contained in The Law Reporter for *November,* 1845, *vol.* 8. *no.* 7. *p.* 336.

*Samuel Johnson Hitchcock* was born of worthy parents in an humble condition of life, at *Bethlem,* in *Connecticut,* in *February,* 1786. His childhood was favored with no superior opportunities for intellectual cultivation. His father was poor, and required his assistance in the mechanical business by which his family was to be supported, and was unable to educate him, or assist in his education. But he so well improved his privilege of attending the common schools, that at fourteen he was employed to teach for the winter in a neighboring parish. He afterwards received gratuitous instruction from Dr. *Azel Backus,* the minister of the parish, and by teaching school in the winter, he was at last, in the autumn of 1806, just as he was coming of age, enabled to enter the sophomore class in *Yale-College.* He was graduated, with the most distinguished honor among his class mates, in 1809. He was obliged to pursue the business of a teacher, for some years afterwards, in order to pay off the debts which he had contracted. He was four years a tutor in *Yale-College.* He selected the legal profession as the employment of the remainder of his life, and in 1815, having been admitted to the bar of the *New-Haven* county court, he established himself in *New-Haven,* as a counsellor at law. He pursued the business of his profession with diligence and success. His habits of business were in the highest degree methodical; his judgment was clear and sound; and his manner of speaking ready and fluent, though not brilliant. His manners were unobtrusive and retiring; but his talents, learning, industry and integrity won for him a high rank in the profession. Some five or six years after his ad-

*Hartford,*
*June, 1845.*

The Enfield
Toll Bridge
Company
*v.*
The Hartford
and New-Ha-
ven Rail-Road
Company.

ought not to be so construed as to extend the prohibition to the crossing in question. For, in the first place, it is not to be presumed that the legislature intended to divest individuals or corporations of their property, without compensation. Secondly, the rail-road charter requires the road to be laid in the most direct and feasible route ; and the court have found that it is so laid. The two charters are to be so construed as to reconcile their provisions. Thirdly, the resolve of 1839 obviously contemplated a crossing, between the *North* line of the state and the *South* line of *Windsor ;* as it authorized the plaintiffs to erect a bridge within those limits, for that purpose. Fourthly, the prohibition in the plaintiffs' charter extends only to another bridge *of the same general character* as that to be constructed by them, and not to a rail-road crossing. The clear import of the plaintiffs' grant is,—You may erect a bridge to accommodate the ordinary travel across *Connecticut* river between *Enfield* and *Suffield*, and take certain tolls; and no other persons shall have liberty *to do the same thing*, within certain limits, during the continuance of your grant. What we authorize you to do, no one else shall do. But did our General Assembly, in 1798, intend to authorize the plaintiffs to erect a rail-road crossing? Such a structure would then have answered no valuable purpose; and would not have entitled the plaintiffs to take tolls. *The Mohawk Bridge Company* v. *The Utica and Schenectady Rail-Road Company,* 6 *Paige* 554. 564, 5. Fifthly, upon the construction claimed by the plaintiffs, no rail-road can be permitted to pass the river, within the prohibited limits. The

mission to the bar, he began to be a professed teacher of the science and practice of the law. His connection with the law school in *New-Haven* gave it a great reputation, and his pupils have everywhere been loud in his praise. He avoided office rather than sought it, and declined a seat on the bench of the superior court of the state, because he deemed his acceptance of that honor incompatible with his duties in other relations. When he had mostly withdrawn himself from the bar, he consented to serve the state, for a while, upon the bench of the county court for the counties of *New-Haven* and *Hartford*. As mayor of the city, and afterwards, as a recorder under the altered charter, he presided in the city court. His influence in society, and especially upon the growth and prosperity of *New-Haven*, was strong and beneficial. He was a consistent Christian, and for nearly twenty-nine years was a devout and constant communicant in the Centre Church of *New-Haven*, of which, in 1833, he was chosen a deacon. He died, at his residence in *New-Haven*, on the 31st of *August*, 1845, in the sixtieth year of his age.                                                        *R.*

plaintiffs' bridge, constructed in conformity to their charter, for a different purpose, is wholly unsuitable for a rail-road crossing : and they cannot be required to alter it, or provide another, for a rail-road crossing. Lastly, the prohibitory clause in the plaintiffs' charter is to be construed strictly as against them, it being in derogation of public and private rights. *Middletown* v. *Sage*, 8 *Conn. R.* 221.

*Hartford,*
*June, 1845,*

The Enfield
Toll Bridge
Company
*v.*
The Hartford
and New-Ha-
ven Rail-Road
Company.

2. That the charter of the defendants, authorizing them to construct a rail-road or way from *Hartford,* by the most direct and feasible route, to the northern line of the state, and thence to *Springfield,* is a constitutional and valid act. In the first place, if private property is taken for this purpose, it is taken *for public use. Beekman* v. *The Saratoga Rail-Road Company,* 3 *Paige* 45. Secondly, the act in question provides *compensation. Priv. Stat.* 1008. It is immaterial in what manner the compensation is settled. The defendants have a right to appraise the franchise of the plaintiffs, and take it at the appraisal. *The Tuckahoe Canal Company* v. *The Tuckahoe and James River Rail-Road Company,* 11 *Leigh* 42. 11 *Pet.* 644. 638. 641. Thirdly, the crossing in question is a part of the rail-road or way. It is one *entire thing* from *Hartford* to *Springfield.* It is as much a rail-road, where it passes a river, call it what you will—a culvert, a viaduct, or a bridge—as it is in any other part.

3. That the defendants were authorized to erect this structure, by virtue of their rights as riparian proprietors. As they own the land on both sides of the river, at a point above tide water, they own the bed of the river there ; and as riparian proprietors, might make any use of the river, or its bed, which was compatible with the public easement, and was not a nuisance. *Adams* v. *Pease,* 2 *Conn R.* 481. *Ang. Tide Wat.* 61. [Many other authorities, which were not read, were here referred to.]

4. That there is nothing in the case which will warrant the interposition of the court, in favour of the plaintiffs, by way of injunction. In the first place, the relief specifically sought, is, that the court will restrain the *completion* of the work. On this prayer the court will not restrain the *use* of it, now that it is completed. Secondly, there is no sufficient ground for an injunction. The court will not interpose in this way to settle abstract rights. The plaintiff must not

*Hartford, June, 1845.*

*The Enfield Toll Bridge Company v. The Hartford and New-Haven Rail-Road Company.*

only establish his right, but must show an actual infraction of it, to his injury ; and this must be, not a mere diminution of the value of the property, but *irreparable mischief.* 2 *Sto. Eq.* 204, 5. *Winstanly* v. *Lee,* 2 *Swanst. R.* 336. *Attorney General* v. *Nichol,* 16 *Ves.* 342. *City of New-York* v. *Mapes* & al. 6 *Johns. Ch. R.* 46. *Jerome* & al. v. *Ross,* 7 *Johns. Ch. R.* 315. Here no actual injury to the plaintiffs' franchise is shown ; but a mere *tendency* that way. The difference between the results of the defendants' acts and a lawful diversion of the travel, is *inappreciable.* On the contrary, the granting of an injunction would do great and irreparable injury, not only to the defendants, but to the public.

5. That the nature of the injury apprehended, is not such as to entitle the plaintiffs to any relief. It results from a better mode of conveyance—an improvement in accommodating the public travel. *The Washington and Baltimore Turnpike Road* v. *The Baltimore and Ohio Rail-Road Company,* 10 *Gill & Johns.* 392. The injury is of the same nature as that done to a patentee, by a new invention of superior merit.

WILLIAMS, Ch. J. The plaintiffs were authorized, by the General Assembly, in the year 1798, to erect a bridge across *Connecticut* river, at *Enfield,* with the power to collect tolls, and an obligation to keep the same in repair for 100 years, with a specification of the subjects of toll. The charter further provided, that no person should have liberty to erect another bridge any where between the *North* line of *Enfield* and the *South* line of *Windsor.* This resolve has been somewhat modified, from time to time, and in 1839, this company were authorized to enlarge the same, or erect another bridge, exclusively for the use of the rail-road company: provided, that nothing therein was to affect, in any way, the rights of the rail-road company under their charter.

A rail-road company has, long since 1798, been incorporated, to build a rail-road from *Hartford* to *Springfield.* The paintiffs went on, and built their bridge, and for many years, have been taking tolls thereon ; and the defendants have gone on, and built their road, and extended the same across the river within the limits protected by the charter of the plaintiffs, by which the travel will, in some degree, be diverted

*Hartford,*
June, 1845.

The Enfield
Toll Bridge
Company
*v.*
The Hartford
and New-Ha-
ven Rail-Road
Company.

from the plaintiffs' bridge. The plaintiffs seek, by injunction, to stop the building of the rail-road bridge; but during the pendency of the plaintiffs' bill, the defendants have gone on and completed their work; and the plaintiffs, stating this fact, in a supplemental bill, claim, that an injunction should issue as as originally asked, or other relief granted. The case was reserved, by the superior court, and several specific questions proposed; but it has been argued without reference to those specific questions, and has been considered and decided, by the court, upon the general merits of the case.

These questions are then presented: Have the plaintiffs any claim for the interposition of this court? And is this the proper remedy?

It was intimated, on the part of the defendants, that the court would not be anxious to assist in the monopoly claimed by the plaintiffs. The court are only anxious to do justice to these parties; but as both claim under legislative charters, and both claim that they have in view a public object, and both have expended considerable sums under their respective grants, we do not think that on either side there is any monopoly, in the odious sense of the term. Both grants were made by the legislature, under an expectation that some public benefit would accrue from them; and such inducements were held out as were intended to carry into effect the proposed objects of their charters. These objects, it has been supposed, would be accomplished with more economy and less danger to the community, if left to private enterprise, than if they should become a subject of the patronage of government; and our legislature have been accustomed to make such grants to individuals, with the right of taking tolls to reimburse the expenses necessarily incurred. And it has been held, that every such grant is exclusive, within the boundary of its obligation and extent. It is in the nature of a contract, which may not be impaired. *7 Conn. R.* 48. But besides this, for the greater certainty and security of the grantee, the legislature have sometimes stipulated, that there should be no rival establishment within a certain distance, or in a limited period. If the law implies an exclusive right in charters of this kind, as has been said by this court, in the case of this *Corporation* v. *The Connecticut River Company,* 7 *Conn. R.* 29—48. an express stipulation to the same effect

*Hartford,*
June, 1845.

The Enfield
Toll Bridge
Company
*v.*
The Hartford
and New Ha-
ven Rail-Road
Company.

must of course be sanctioned. Its expediency must be a matter of legislative discretion.

When such stipulations are made, it becomes the duty of the court to give them such construction as will carry them into full effect.

To induce these plaintiffs to undertake the work, they had in view, which, at that time, was considered a great work, it was expressly provided, that no person or persons should have liberty to build another bridge between the *North* line of said *Enfield* and the *South* line of *Windsor,* across said river. The terms here are explicit, not depending upon construction.

The question, then, arises, are the defendants violating the rights of the plaintiffs thus acquired? That they are passing *Connecticut* river constantly, with their locomotives and the train, on a structure they have laid across said river, by authority of the General Assembly, and within the limits secured to the plaintiffs, is not denied. But they say, this is not a bridge, or such a bridge as is contemplated by the plaintiffs' charter.

The defendants claim they have a grant, under which they have a right to lay a rail-road or way from *Hartford* to *Springfield;* that this of course imports a right to cross *Connecticut* river; that this structure over the river, is part of their rail-way, and not a bridge in the sense of the charter. What then is a bridge? It is a structure of wood, iron, brick or stone, ordinarily erected over a river, brook or lake, for the more convenient passage of persons and beasts, and the transportation of baggage; and whether it is a wide raft of logs floating upon the water, and bound together with withs, or whether it rests on piles of wood, or stone abutments, or arches, it is still a bridge. The particular manner in which this structure is built, is not described; but it is said to be much in the manner common to rail-road bridges, the bottom covered with plank, and the sides secured by railing. It is a matter of notoriety, that rail-road bridges are built upon solid abutments of mason-work, and resting on piers of stone between the abutments, thus giving strength and security to the frame above. It is not easy to see wherein such a structure differs from an ordinary bridge, except that as it is to endure a greater burthen, it is more solid and substantial.

It is true, the plank and rails upon it are laid in a manner most convenient for the cars which are to pass it, and not convenient for—perhaps not admitting—common vehicles, and not intended for, though admitting, the passage of foot passengers.

*Hartford,*
June, 1845.

The Enfield
Toll Bridge
Company
*v.*
The Hartford
and New-Ha-
ven Rail-Road
Company.

It would seem, therefore, as if this was what would be ordinarily called *a bridge*. But we agree with the defendants' counsel, that it is not the name, which is sufficient to designate it. We then must consider the object—what was the intent of this structure? The safe and expeditious passage of persons, whether from greater or less distances, over this stream, in the cars or carriages provided for that purpose, together with all baggage or freight entrusted to the care of the company. It may not, and is not intended to, accomplish all the objects of a common bridge, as it is not adapted to the common vehicles in use. But can that fact change its character as a bridge? A bridge adapted only to foot passengers would still be a bridge; and it would hardly be claimed, that such a bridge might be erected by the side of the plaintiffs', under the provisions of this act. We find, then, a structure of the form of a bridge, with the name of a bridge, and of the character of a bridge. But go a step further, and see if it is not doing the business of a bridge? Certain facts are not specifically found, which we all know must exist; such as that every passenger in the cars from *Hartford* to *Springfield* must cross this river upon this bridge within the limits secured to the plaintiffs. It is certainly doing at least some, if not much, of the business which the plaintiffs had a fair right to expect, under their grant. We find, then, this structure, with the form of a bridge, with the name of a bridge, with the character of a bridge, doing its work, and in this way doing the very injury to the plaintiffs, which this proviso was designed to guard against. We cannot then but conclude it is a bridge.

It is said, it is not the bridge contemplated in the act, or " another bridge." It cannot be claimed, that by another bridge, was intended a bridge exactly like this, or that a bridge of iron, or stones, would not be within the provision, or even a bridge of boats; nor can it be claimed, that a bridge much safer or stronger, would not be equally within the prohibitions. Nor is it the improvement in the structure

*Hartford,*
June, 1845.

The Enfield
Toll Bridge
Company
*v.*
The Hartford
and New-Ha-
ven Rail-Road
Company.

of the bridge, nor the additional safety it affords to travellers, that will give the rights, or constitute it "another bridge." That it was understood, by the legislature and the persons incorporated, that the structure to be erected over *Connecticut* river, was a bridge, in the ordinary acception of the term, is apparent from the 16th section of the charter of the *Springfield Rail-Road Company*, in which it is resolved, that should it be necessary to erect a bridge across *Connecticut* river, it should be for the sole use of the rail-road train, and for no other travel; and it should not be lawful for the company to permit other carriages &c. to pass; and by that provision, it would seem, it was intended to guard the rights of the plaintiffs. For the 19th section contains a proviso, That nothing herein contained shall be construed to prejudice or impair any of the rights now vested in the *Enfield Bridge Company*.

It is further claimed, that when the plaintiffs' charter was granted, rail-roads were unknown; therefore, it cannot be supposed the legislature intended bridges connected with rail-roads. The fact that rail-roads were then unknown, is denied by the plaintiffs. Without going minutely into their history, we believe, that for all practical purposes of public travel, rail-roads were, in the year 1798, unknown, in this country at least. But whether the fact is so or not, it can make no difference. Is a grant of this kind, which we have adjudged to be a contract, to be set aside, because an advantage not contemplated at the time, may result from its violation? Is there any implied condition, in such a grant, that upon some new improvement being made, the grant should be void? How would such a claim be treated in other cases of great public improvement? Suppose the city of *New-York* had leased *Fulton* ferry for a term of years, when no boats were known but those which were moved by the hand and wind, or tide; after the introduction of steam-boats, could they have leased the ferry to the persons, who would navigate it by steam? Or could the legislature do this, if they had granted the ferry? We know of no principle, by which this case can be distinguished from that.

But it is asked, are the public thus to be deprived of all great improvements? If it come to this, that public faith is to be violated, or the benefit of such improvements lost, we

*Hartford*
June, 1845.

The Enfield
Toll Bridge
Company
*v.*
The Hartford
and New-Ha-
ven Rail-Road
Company.

say banish the improvement! The community will profit more, by preserving public faith, than they will gain by its violation; although for a time, it may seem otherwise. But we do not believe, that either course need be taken. We think there is a conservative principle, by which the improvement may be had, and good faith preserved. It is this; that private property may be taken for public use, upon compensation made. This is a great principle recognized by our constitution, when it says, " private property shall not be taken for public use, without just compensation made therefor."

That a rail-road is for public use, though granted to a private company, has been decided, so far as we are informed, by every tribunal where the question has been made, and recognized, by the silent acquiescence of all concerned, in this state. Why then should not that principle be applied, in the present case? We have heard of no objection, except that it impairs the obligation of the contract, by which this company are to have the exclusive privilege. And after the decision made by this court, in two recent cases, we certainly should not willingly make a decision, which could be supposed to have that effect. *Enfield Toll Bridge Company* v. *The Connecticut River Company,* 7 *Conn. R.* 30. *The Derby Turnpike Company* v. *Parks,* 10 *Conn. R.* 522. We know there are some respectable opinions on that side—two of the Judges of *Massachusetts,* in the *Charles River Bridge* v. *Warren Bridge,* 7 *Pick.* 344. And the opinion of Judge *Mc Lean,* in the same case, in the supreme court of the *U. S.* 11 *Peters* 506. It may perhaps be said, that in the case of the *Chesapeak and Ohio Canal Company* v. *Baltimore and Ohio Rail-Road Company,* 4 *Gill & Johns.* 1. there is a similar opinion. But the facts in that differ so materially from those in this and the other cases alluded to, and the court differed so much in opinion from each other, that little will be added to the weight of any opinion on this point from that case.

But the point was directly decided, by the supreme court of *Massachusetts,* long after these opinions. *Boston Water Power Company* v. *The Boston and Worcester Rail-Road Corporation,* 23 *Pick.* 360. The same question has been also decided, by the supreme court of *New-Hampshire* and *Vermont,* in the same way. *Piscataqua' Bridge Co.* v. *N. H. Bridge Co.* 7 *N. H. R.* 67. *Backus* v. *Lebanon,* 11 *N. H. R.*

*Hartford,*
June, 1845.

The Enfield
Toll Bridge
Company
*v.*
The Hartford
and New-Ha-
ven Rail-Road
Company.

122. *Armington* v. *Barnet & al.* 15 *Ver. R.* 745. And the court of appeals in the state of *Virginia* seem to have come to the same result. *Tuckahoe Canal Co.* v. *Tuckahoe Rail-Road Co.,* 11 *Leigh* 42. 76. And in the case above cited from *Peters,* Judge *Story* and Judge *Thompson* explicitly admit, that if the public exigencies require that the franchise of *Charles River Bridge* should be taken away or impaired, this might lawfully be done, making due compensation to the proprietors. 11 *Pet.* 638. And to a majority of the court, it appears, this decision is correct.

What are the rights of the plaintiffs? They are derived from the grant of the legislature, and are what in law is known to be a *franchise ;* and a franchise is an incorporeal hereditament, known as a species of property, as well as any estate in lands. It is property, which may be bought and sold, which will descend to heirs, and may be devised. Its value is greater or less, according to the privilege granted to the proprietors. The owner of such property may repose, with the same security for its protection, under the wings of the constitution; but we know not why he should expect any greater exemption from public burthen, than the owner of any other estate. It was the intention of those who made that instrument, that the rights of all should be secured, and equally secured. If, as we believe, it is a conceded point, that the owners of lands, buildings and all property of this description, must yield up that property for public use, upon compensation, how is it, that property of this kind claims a higher privilege, or is guarded by stronger force? If any property ought to be peculiarly guarded, it certainly is not that which is merely a matter of dollars and cents, but it should be the homestead, the fireside, the place where the owner has enjoyed his domestic comforts, and where he hopes to spend his declining years; and yet this must be yielded to public exigencies. The one, it is said, is holden directly by grant of the legislature, and to take it away, is impairing the contract. But are not all our lands held under a grant from the legislature, directly or indirectly? Was not the property all apportioned out, under legislative supervision? Take the case of a grant of land made, as many have been, and as in some states they constantly are now made, directly by the state, to an individual; may not this land be

taken, by the government, for highways, for rail-roads, or any other public purposes? This will not be denied. Is this impairing the contract? It will hardly be claimed. But when the state grants a tract of land, they grant an estate in fee, as much as when an individual grants it; but in both cases, it is subject to the right to retake it for public use, on compensation made. The fact is, that such has been the law of nations upon this subject, that there is reserved or implied a right in the state of this sort: that is to say, they have the same right to the use of the property they have granted, that they have to other property, and no more. They have the right of eminent domain; and we know of no principle which should limit this right to lands, or other real estate.

The right rests upon the principle, that individual interests must be subservient to that of the public, and that they must yield, when public necessities require. This, however, in constitutional governments, is not to be done, but upon compensation. The principle, then, is broad enough to include all kinds of property.

But the argument is based on this, that you are then impairing your own contract, and thus violating the letter of the constitution. This is to assume that there is no implied reservation, in any contract with the state, of the right of eminent domain, or that it does not apply to cases of this kind. If, as we suppose, it is admitted in the case of a grant of land, we ask why the same principle does not extend to other grants? It is said, however, that the constitutional provision, does not extend to a grant of lands; for that is a contract executed.

But it was decided in *Fletcher* v. *Peck*, 6 *Cranch*, 87–137. that a contract executed, was a contract within the meaning of the constitution of the *United States*; and that case remains, and we trust will remain, unshaken. We cannot see, then, why contracts executed and executing, are not, as it regards this provision, placed, by the supreme court, upon the same ground. If, therefore, it is not a violation of this clause in the constitution, to take land, granted by the state, for public uses, we cannot see how it should be any more a violation, to take other property, even although that property rests on an unexecuted contract. The doctrine seems to be countenanced by the words, rather than by the spirit, of the constitution.

*Hartford*, June, 1845.

The Enfield Toll Bridge Company *v.* The Hartford and New-Haven Rail-Road Company.

*Hartford*,
June, 1845.

The Enfield
Toll Bridge
Company
*v.*
The Hartford
and New-Ha-
ven Rail-Road
Company.

Suppose, for instance, a grant was made of a piece of land adjoining a stream in fee ; and at a future time, a grant was made of a ferry over the stream in fee ; and in the progress of time, a bridge was required at that place ; would the public take the land granted, making compensation, and yet have no power to take the ferry, upon compensation ? Could the constitution intend to make a distinction so refined ? We cannot believe it. We think the constitution was intended to settle great principles, and to settle them in such a manner as to afford equal protection to all persons and to all property. It did not intend to take from the states a right which seems incident to sovereignty, but to provide against its abuse. It left the right, whatever it was, as it found it ; but provided, that it should never be exercised, except upon compensation made ; thus securing to the states a power all-important to their safety and comfort, and providing, however, that this should not be exercised at the expense of individuals.

It has been said, that in a case like this, the law acts upon the contract itself ; whereas, when the contract is executed, it operates only upon the interest under it. It is not easy to see how a law taking property acquired under a contract with the state, can be constitutional, and a law preventing the acquisition of property under that contract, can be unconstitutional. It seems, in effect, to say, that it is constitutional to take from a man the fruits of his labour, but it is unconstitutional to prevent him from gathering those fruits. In this case, the franchise is not in fact taken, but its value is in some measure impaired ; and we see not why compensation may not be made for this, as well as for any other injury to property. For the purposes of this case, it is not absolutely necessary to decide the question ; because, if the legislature has no right, upon any terms, to grant the privilege which the defendants claim, it would take away entirely this part of the defence.

Again, it is said that the plaintiffs' charter cannot deprive the defendants of their common law rights, but was only intended to assure the plaintiffs that the General Assembly would grant no liberty to others to build a bridge within the limits.

The defendants claim, and it is not denied, that the place where the rail-road crosses *Connecticut* river, is above tide

water; and it is found, that the defendants own the land on both sides of the way. They therefore say, the river is not navigable, and so they have right to erect a bridge on their own premises for their own use. This court have decided, that above tide water, the adjoining proprietors have the right of fishing in the stream; (*Adams* v. *Pease*, 2 *Conn. R.* 480.) but it has not been decided, that such proprietors have the right of erecting bridges or ferries, at their pleasure, across the stream. On the contrary, the Chief Justice, in delivering the opinion of the court, says, that the public have a right or easement in such rivers, as common highways, for passing with vessels, boats, or any water craft. The court intend to adopt the common law; and they say, a more perfect system could not be devised. By the common law, some streams are private, not only in propriety or ownership, but also in use, as little streams and rivers that are not a common passage for the king's people. Again, there are other rivers, as well fresh as salt, that are of common or public use for the carriage of boats and lighters; and then, whether they are fresh or salt, whether they flow and reflow or not, are *prima facie publici juris*, common highways for men or goods, or both, from one inland town to another. *Harg. L. T. ch.* iii. 8. 9. They are, it is said, highways by water; and all things of public safety and convenience, being, in a special manner, under the king's care, supervision and protection. *Ch.* ii. 8.

These principles are adopted in the state of *New-York*. *Palmer* v. *Mulligan*, 3 *Caines*, 314.; and in *Hooker* v. *Cummings*, *Spencer*, Ch. J., says, the common law of *England* considers a river in which the tide ebbs and flows, an arm of the sea, and navigable, and devoted to the public use. It also considers other rivers, in which the tide does not ebb and flow, as navigable; but not so far belonging to the public as to divest the owners of the adjoining lands of their exclusive right to fisheries. 20 *Johns. R.* 100. Were other authorities needed, we might refer to *The Canal Appraisers* v. *The People*, 5 *Wend.* 444. 17 *Wend.* 594. *Commonwealth* v. *Charlestown*, 4 *Pick.* 180. 188. *Bowman's* devisees v. *Wathen* & al. 2 *McLean*, 377. 382.

*Connecticut* river, then, is a navigable stream, for certain purposes, above tide water; and it does not follow, therefore,

*Hartford,*
*June,* 1845.

The Enfield
Toll Bridge
Company
*v.*
The Hartford
and New-Haven Rail-Road
Company.

*Hartford,*
June, 1845.

The Enfield
Toll Bridge
Company
*v.*
The Hartford
and New-Ha-
ven Rail-Road
Company.

as seems to be supposed by the defendants, that they have right, at their pleasure, to establish ferries and build bridges, because they own the land on both sides.    We have shown, that at common law, such streams, being things of common safety and convenience, are under the care of the king; and in this state, our earliest history will evince, that it has been considered the duty of the public to provide accommodations for the passage of such streams.    Ferries and bridges, there-fore, have been ordinarily provided and regulated by the leg-islature.    Such, too, has been the case in other states.    *Com-monwealth* v. *Charlestown*, 1 *Pick.* 180. 184.    *Charles River Bridge* v. *Warren Bridge*, 7 *Pick.* 515.    9 *Wheat. R.* 97. n.    And it is a well settled principle of common law, that no man may set up a ferry for all passengers, without prescrip-tion time out of mind, or a charter from the king.    He may make a ferry for his own use, or the use of his family; but not for the common use of all the king's subjects passing that way; because it doth in consequence tend to a common charge, and is become a thing of public interest and use; and every ferry ought to be under a public regulation.    *Harg. L. T. ch.* ii. 6.    This principle is also recognized, in the case cited from the 20 *Johns. R.* and in 2 *McLean* 383. and the judge, in the case last cited, says, " and for this accommoda-tion of the public, the government is not only authorized, but bound, to make suitable provision."    On this ground, he says, licenses to keep ferries are granted.

If, then, it is the duty of the government to provide ferries and bridges, and regulate the same, it must follow, that an individual, without license, cannot establish a ferry or erect a bridge, to the detriment of one so licensed; and so we find it every where settled.    3 *Bla. Com.* 219.    *Fitz. N. B.* 184. *Ogden* v. *Gibbons*, 4 *Johns. Ch. R.* 150. 160, 1.    *The New-burgh and Cochecton Turnpike Road* v. *Miller* & al. 5 *Johns. Ch. R.* 101. 110.    *Charles River Bridge* v. *Warren Bridge*, 7 *Pick.* 515.    And if a stream is navigable for any useful purpose, none but the legislature can authorize any interruption of it.    1 *Pick.* 187.

Will it be said, that this bridge is erected for the accommo-dation of the defendants only, and nothing is allowed to pass but their own engine and cars.    See how this right is re-strained in the authorities cited: " He may make a ferry for

his own use, or the use of his family ;" and the man who sets up a ferry without license, may as well protect himself under the plea that his own boats only pass, as the defendants, that only their own cars pass. The object in both cases, is, as it respects themselves, a matter of profit, and not the accommodation of themselves and their families. While, then, the defendants may accommodate themselves or their families, by a bridge or boat on their own land, if no public injury occur ; they have no right to interfere with those whom the public have particularly licensed for this duty, and who, in consequence thereof, are bound, at all times, to give reasonable accommodation to the public, and who are responsible, if they do not. *Harg. L. T.* 11. *ch.* 6. Besides, if the defendants claim this, as matter of their own accommodation, and not a matter of public interest, then the charter, by which they claim to take the lands of individuals for their rail-road, without their consent, is invalid, and their grant worthless, as it would be taking private property for private (not for public) use.

Whether, therefore, we consider the defendants' case as resting upon their chartered rights, or on their claims as riparian proprietors, we come to the same result.

The remaining question is, whether, upon this application, the plaintiffs are entitled to the remedy they seek. The original bill showed, that the defendants were building their bridge, and prayed for an injunction, or other relief. The supplemental bill shows, that the bridge is built, and makes the same prayer. Now, it is said, that the relief sought does not correspond with that prayed for in the bill ; for as the bridge is built, the court cannot enjoin against its being built. But it does not seem to the court, that such a construction should be given, as that the defendants should be suffered to take advantage of their own acts, now held to be unlawful, connected with the delays incident to the trial of a cause, to defeat a claim properly commenced. The relief then sought was that adapted to the case ; and could the remedy have been then applied, or had the defendants respected the process, with intent to abide its award, the relief would have been precisely what was asked. To say now, that the remedy cannot be had, is to say, that the plaintiffs shall be turned round, by the wrongful act of the defendants, or by a delay

*Hartford,*
June, 1845.

The Enfield Toll Bridge Company
*v.*
The Hartford and New-Haven Rail-Road Company.

*Hartford,*
*June, 1845.*

The Enfield
Toll Bridge
Company
*v.*
The Hartford
and New-Ha-
ven Rail-Road
Company.

in the course of legal proceedings for which they cannot be responsible; neither of which is admissible. It seems to us, that the general prayer for relief is peculiarly appropriate to a case like this.

It is also said, that there are no appreciable damages to the plaintiffs; and therefore, the court will not interfere. The court do not find what the damage is; nor is it necessary. They say, the bridge of the defendants will have a tendency, in some degree, to divert travel from the plaintiffs' bridge. This must, of course, impair the value and lessen the profits; and must occasion damage. What the amount is, it is not for us to say. It is true, that the court find, that this damage is but little more than it would have been, a little above, or a little below, the protected line. That leaves it, to be sure, uncertain what the damage would be. It implies some damage. Such a fact must impair the value of the plaintiffs' franchise, and diminish their profits. And it is said, that small injuries are as much prohibited as larger ones; and that the least right is as anxiously protected as the greatest; (*per Hosmer*, Ch. J., 7 *Conn. R.* 48.) and we do not need to be told, by a jury, that there must of course be some injury to the plaintiffs.

It was also said, that the damage, if any, arises from the better mode of travel, and therefore, furnishes no cause of complaint. But it does not lessen the injury to the plaintiffs, that the defendants, or the public, derive great benefit from it. They may enquire, can this be done at their expense?

It is said, this is a matter of discretion, and will not be exercised when the injury is not irreparable. But it has been adjudged by this court, that when the right was not doubtful, an injunction would always be granted to secure the enjoyment of a stated privilege, of which the party is in the actual possession; and it was added, that to restrain a multiplicity of suits, and prevent immediate damage to a statute privilege, is the exercise of a sound discretion. *Enfield Toll Bridge Company* v. *The Connecticut River Company*, 7 *Conn. R.* 50. 51. *Hartford Bridge Company* v. *East-Hartford*, 16 *Conn. R.* 149.

The result is, that the superior court be advised to grant an injunction.

*Hartford,*
June, 1845.

In this opinion the other Judges ultimately concurred; though HINMAN, J., at first thought, that the structure of the defendants was not " a bridge" within the meaning of the plaintiffs' charter.