Between THE PROPRIETORS OF THE BRIDGES OVER THE RIVERS PASSAIC AND HACKENSACK, appellants, and THE HOBOKEN LAND AND IMPROVEMENT COMPANY, respondents.

The legislature, in 1790, incorporated the complainants, and gave them the power to build a bridge over the Hackensack river, to take tolls for man and beast passing over it, and by the same law enacted that it should not be lawful for any person whatever to erect any other bridge over said river for an hundred years.

In 1860, the legislature gave to the defendants power to build a railway from Hoboken to Newark, with the necessary viaduct over the said river Hackensack.

Under this last act, the defendants commenced to build a viaduct over the said river, described in their answer to the bill of complaint thus: "a structure, so as to lay iron rails thereon, upon which engines and cars may be moved and propelled by steam, not to be connected with the shore on either side of said river, except by a piece of timber under each rail, and in such a manner, as near as may be, so as to make it impossible for man or beast to cross said river upon said structure, except in the cars of the defendants; that the only roadway between said shores and

said structure will be two or more iron rails, two and a quarter inches wide, four and a half inches high, laid and fastened upon said timber four feet ten inches asunder."

*Held,* 1. That the said proposed structure was no bridge within the meaning of the complainants' charter.

2. That no structure across the river Hackensack, which had not a footway for man and beast to walk over on; was a bridge within the meaning of the complainants' charter. ·

3. That the term bridge, as known to the common law, was a structure over a river having a footpath for man and beast; and cases upon this subject reviewed.

4. By the complainants' charter, they may collect tolls from men walking over their bridge, and for animals walking over their bridge drawing their burthens; by the defendants' charter, they cannot collect tolls for such use of their structure: *held,* that the franchises given the defendants are not the same franchises as those given to the complainants, and therefore do not interfere with them.

5. The first, fifth, and sixth sections of the defendants' charter commented on and construed.

·*Zabriskie* and *Attorney General,* for appellants.

*Gilchrist* and *Bradley,* for respondents.

VREDENBURGH, J.  The appellants and complainants below filed their bill against the defendants, alleging that, in 1790, the legislature gave them the right to build a bridge over the Hackensack, and to take tolls for man and other animals carrying or drawing their burthens· passing over it, and by the same law enacted, that it should not be lawful for any person whatever to erect any other bridge over said river; that they erected said bridge soon after, and have ever since been in the enjoy-. ment of the tolls; that, in 1860, the legislature gave the. defendants power to build a railway from Hoboken to Newark, with the necessary viaduct over the said river Hackensack, and that, by virtue thereof, the defendants have commenced, and intend to build a railroad bridge over said river, to the diminution of their tolls and without having made or tendered them compensation.  They aver that the defendants' proposed bridge would be a

nuisance upon their exclusive grant, and pray an injunction. To this complaint the defendants set up a variety of answers. Without expressing any opinion upon the others, I shall only consider the following three, *viz.*

*First.* That the complainants' charter does not confer on them a valid exclusive grant.

*Second.* That the structure the defendants propose to build is no bridge within the meaning of the complainants' charter.

*Thirdly.* That if it is, that it cannot interfere with any of their franchises.

1. Does the complainants' charter confer on them a valid exclusive grant to bridge the Hackensack?

The court below has found that it does. But as I conceive that the exigencies of the case do not demand its solution, I shall merely remark that, as regards this first question, I neither concur in or dissent from the opinion of the Chancellor. I shall however assume, in what I have to say, that he in this regard was right.

2. Is the structure the defendants propose to build a bridge?

The grant of power to the complainants is to build a bridge—the franchise is to enjoy the tolls granted. The prohibition is, that it shall not be lawful for any person to build any other bridge over the Hackensack. The defendants, in their answer, deny that they have commenced or intend to build *any* bridge within the meaning of the complainants' charter. They describe, however, very specifically the structure they *do* intend to build. In order, therefore, to entitle the complainants to their injunction, it must appear, from the answer, that the defendants' proposed structure would be a bridge.

In considering this question, the first idea which strikes us is, at what time are we to affix its meaning to the term bridge—in 1790 or in 1860? Nothing is more changeable than language. This is apparent from the numerous languages and dialects in the world. The English of to-

day is a very different thing from that of Chaucer, or of even Shakspeare. We know, from our own observation, that all vocal signs are in a process, more or less rapid, of continual change. The term bridge is a sign for a thing: It may now stand as the sign for things which it did not stand for in 1790. I shall attempt to show hereafter that in this particular case it does not; but it may be so, and it is best, at the start, to settle at what time we are to take its meaning, for we cannot otherwise reason about it. If the structure the defendants propose to build had been erected in 1790, and would *then* have been called or been a bridge, it is within the terms of the prohibition. But if it would not *then* have been called or been a bridge, it could not become so *since*, within the meaning of the statute of 1790, by merely acquiring that name, or because we since have discovered a mode of passing over it. A structure which was not a bridge in 1790 does not become one by merely discovering a mode of passing over it. All we can say in such cases is, that since 1790, however, science has discovered a mode of passing over rivers on structures which were not bridges. Steam ferries have been discovered since 1790. Suppose they had since, in common parlance, come to be called ferry bridges, would they be within the prohibition? They are sometimes called so now. We say, the East river has been bridged by the ferries. Since the use of ocean steamers, the Atlantic is sometimes said to be bridged; and we do not know but that before this exclusive grant expires they may both, in common parlance, be called bridges. But if this should happen, surely that could not bring them within this prohibition. So with respect to the proposed structure of the defendants. If it had been erected in 1790, and would not in its essential structure have been a bridge, as the term was then used, it could not become so afterwards merely because we have discovered a mode of passing over it, or because it has since been called a railroad bridge or simply a bridge. To allow this

would be to extend the exclusive grant over structures not embraced in the original grant, and that not by legislative power, but simply by enlarging the comprehensiveness of a word.

Our inquiry therefore is, what was the meaning of the term bridge in 1790? The term bridge is but the sign for a thing. What material thing did it then stand for in 1790, was it the sign of such a thing as the defendants propose to build? Of this the only arbiter is use, "*usus est arbiter et norma loquendi.*" Before 1790, was the term bridge ever used to signify a thing in its essential structure like this proposed by the defendants?

In considering this, I shall assume as correct all the suggestions the complainants have made as to the rules for construing statutes. This is a question rather of precise definition than of the construction of language; as soon as we agree what meaning the term bridge had in 1790 the whole question is settled. I shall also assent to another suggestion of the complainants, *viz.* that their charter prohibits all kinds of bridges. If the proposed structure of the defendants had been erected in 1790, and would *then* have been within the meaning of the term bridge, it is within the prohibition. The complainants' charter intended to forbid bridges of all kinds whatever; but then it embraced nothing but a bridge. The thing prohibited must be a bridge.

I shall also assent to another suggestion of the complainants, that if the proposed structure of the defendants had been erected in 1790, and would in its essential structure have been a bridge, that it would have been within the prohibition, whether its peculiar kind was then known and in the contemplation of the legislature or was discovered afterwards. The legislature intended to prohibit all kinds of bridges whatever, whether then known or not; as for instance, the tubular bridge over the St. Lawrence, or the iron wire bridge over the Niagara, were

kinds of bridges unknown in 1790, but they are in their essential structure bridges, and within the prohibition.

The question still remains, is the proposed structure of the defendants such a one as, in 1790, would have been called a bridge? In considering the question, I shall invoke the rules of construction urged by the complainants upon the argument, and the following ones in particular: "If the words of a statute are in themselves precise and unambiguous, then no more can be necessary than to expound the words in their ordinary and natural sense. The words themselves alone do, in such case, but declare the intention of the lawgiver." And again, "words are generally to be understood in their usual and most known signification." And again, "the words of a statute are to be taken in their ordinary and familiar signification and import, and regard is to be had to their general and popular use."

Bearing these familiar rules in memory, let us paint the defendants' proposed structure to the eye, and see whether, in 1790, it would have been called a bridge, or been a bridge of any kind whatever, according to its general or popular use, or according to its technical use, or, I might safely add, any use whatever.

The answer describes the proposed structure very particularly. The defendants admit that they intend to erect a structure, so as to lay iron rails thereon, upon which engines and cars may be moved and propelled by steam; that said structure will not be connected with the shore on either side of said river, except by a piece of timber under each rail, and must necessarily be made in such a manner, as near as may be, so as to make it impossible for man or beast to cross said river upon said structure except in the cars of the defendants; that the only roadway between said shores and said structure will be two or more iron rails, each of the width of two and and one-quarter inches, and of the height of four and a half inches, laid and fastened upon timber, said rails

being at a distance of four feet ten inches asunder. It will be perceived that the defendants do not propose to erect any mixed structure, such as, for instance, the railroad bridge over the Raritan at New Brunswick, or Rœbling's bridge over the Niagara, which have a common bridge below and a railroad bridge above; nor is it a structure with a pathway and rails laid on them like a street railroad, and which furnish footpaths, but is a railway pure and simple, according to its original conception, elevated above the ground. The elemental idea of this structure of the defendants is two rails laid across the river, so narrow and so wide apart as that neither man or beast can walk over it. It has no pathway—it has no horseway—it has no wagonway—it has no roadway. If such a thing had been built in 1790, would it have been called or been a bridge of any kind whatever? If it would not, would it become so because we have *since* discovered a mode of being passed over it? The legislature of 1790 intended to give to the complainants a monopoly of the travelling over bridges, but they did not enact, nor did they intend to enact, that mankind, in the coming time, should not discover and use a mode of being passed over rivers on structures which were not bridges.

I repeat, is this proposed structure a bridge within the meaning of the term as used in the charter of 1790? What kind of a structure was in 1790 represented by the sign bridge? *It did not in 1790, or ever before or since, represent any structure or material thing which had not a footway across the stream.* Nor for the last thousand years has the term bridge, either in England or this country, represented any structure which had not a footway, a horseway, and a wagonway. The footway for man and beast is of the very essence of the bridge. It is that, with respect to bridges, without which nothing. The footway is the bridge, and the bridge is the footway. What must have been the history of civilization upon this subject? A bridge, reduced to its simplest elements, is a plank

2 U*

resting on the natural banks, furnishing a footpath. This footpath is the seminal principle of the bridge. All the rest is but growth and development. Take away the plank, and there is nothing of a bridge. The next advance would be, perhaps, a natural rock in the middle of the stream, serving as a rude pier for the ends of the planks to rest upon. Again, take away the planks, and there is nothing of the bridge. Adding the artificial pier or the artificial abutment is nothing towards a bridge. Neither are necessary. It is still the pathway that is the bridge. So when, in the progress of skill, they widen the pathway to make it a horseway, and then again widen it so that beasts may draw wagons after them, it is still the pathway that makes the bridge. So when they add handrails and balustrades, it is only to make the bridge, as we commonly say, or the pathway more secure. And so, in all its stages of development, from the rude plank to Trajan's magnificent arches over the Danube, or to Rœbling's sublime but inverted arch over the boiling chasm of Niagara, or Stevenson's rigid tubes over the wide waters of the St. Lawrence, it is the pathway only that makes the bridge. The pathway, by whatever contrivance supported, whether supported on the natural banks and rock or the strong towers of Niagara,—whatever the kind of bridge or by whatever name called, it is the pathway that makes the bridge, whether it be a floating or a flying bridge, whether of boats like that of Xerxes over the Dardanelles, or of pontoons, like that with which a modern general crosses an interposing stream, whether built upon piers or upon arches, whether suspended upon ropes or sustained by its own rigidity, whether built of wood or stone, of cast or wrought iron, whether a chain bridge or wire bridge, whether one arch or many, whether resting on piling or on solid piers, whether covered or not, whether with handrailings or balustrades or not, it is still the pathway that makes the bridge. Nor has any structure, which in its development

stopped short of this pathway for man and beast, ever in ancient or in modern times, in any country or in any language having a synonyme for the term, been called a bridge. I have been able to find no royal charter, no act of parliament, from the time the word bridge first fell from the lips of our Anglo Saxon ancestors until the present moment, no act of the legislature in our own state or any of our sister states, from the earliest colonial records, no decision of any court, at any time or in any country whatever, no dictionary, no encyclopedia, no work on mechanical science, no scientific work specially upon bridges, where a structure without a pathway was ever denominated a bridge.

The very nature and essence of the thing forbid that there should be a bridge without a pathway. The bridge, for all time and in all countries, has been but the continuation of the ordinary roadway. The only difference between a bridge and the rest of the road is, that in the road, the pathway rests immediately on the earth, while in the bridge it does not. Whenever the pathway of the ordinary road does not rest immediately on the earth it is called a bridge, by whatever contrivance supported, whether by water, by piers, by arches, by wires, by tubes, and whether it passes over rivers or gorges, or ravines or valleys, or canals or railroads, and we can just as well have a road without a bottom as a bridge without a footway.

Although I feel that I should apologize for so doing, I will, notwithstanding, consider this question a little longer. As I have before remarked, the only arbiter of the meaning of a term is use, and the best evidence of this use is to be found—first, in the different provisions of the act of 1790; secondly, in the provisions of the different acts of parliament from early times to the present, in the royal patents for building toll bridges, in the acts of our own and other states, from works on mechanical science, from history and from tradition, and our own use

in our own times.   Let us first examine the act in question, and ascertain if by possibility the legislature of 1790 could have deemed a structure across the Hackensack without a pathway for man or beast to be a bridge, a bridge of any kind whatever.   It will be recollected that they were providing against competition by bridges. They were not providing against competition by any other mode of crossing the river.   It was not providing against competition by ferries, by canals, by telegraph, by balloons, or by tunnels.   The legislature were not providing against competition by structures which were not bridges.   They did not intend to say that there should be no discovery of modes of passing over structures which were not bridges.   When they spoke of bridges they knew what they were dealing with.   They had existed for untold centuries, and they could estimate, with some degree of accuracy, what effect the grant of a monopoly would have for a hundred years, nor in this case would their calculations have been much out of the way; nor can we, even at this day, say the act was not a wise one. But they could not deal with or estimate the effects of a prohibition for an hundred years of discoveries, which would enable men to be crossed over rivers upon structures which were not bridges, as the result has proved; nor did they intend, nor am I certain that they would have had any constitutional power, thus, in order to benefit the present, to dwarf future generations, thus to mummy up, as it were, an infant nation in its swaddling clothes.

But let us return to this charter of 1790.   Can it be possible, under its provisions, that any structure across the Hackensack, which had no footway, horseway, roadway, or wagonway, could have been deemed a bridge? The charter gives to the complainants the power to build a bridge over the Hackensack, but it does not prescribe what kind of a bridge it shall be; the kind is left entirely to the discretion of the complainants.   Now, if the

defendants' proposed structure be a bridge, if there can
be a bridge without a footway, then it would have been
competent for them to have built such a structure as that
of the defendants, and insisted that they had performed
the conditions of their charter. Suppose they had done
so, and called the conscript fathers of that legislature to
look at a couple of iron rails, without any footway, laid
across the river, and told them that that was a bridge, and
that it gave them an exclusive right for an hundred years
to stop all passage across the river, except upon their con-
trivance, would not the conscript fathers aforesaid have
deemed themselves mocked? If such a structure could
have been deemed a bridge, would the legislature, when
they were providing by act to facilitate the passage across
the river, have done an act which would have barred the
passage for an hundred years? We can only account for
this in one way, and that is, that the term bridge, *ex vi
termini*, meant a footway; and an idea that a structure
without a footway could be a bridge, never was dreamed
of by any one.

The title of the act is, an act for building bridges over
the Passaic and Hackensack. The preamble commences
—" whereas the public good will be advanced by erecting
bridges over the said rivers." No kind is prescribed—
any kind answers the conditions of the charter. The
complainants say, two iron wires, stretched across the
river, without a pathway, without a horseway, without a
wagonway, is a kind of bridge. If so, it would have com-
plied with the charter; and if so, how could, as said in
the preamble, the public good have been advanced? Is
it not manifest from this that the legislature, by the term
bridge, could not have meant any structure which had
not a footway? But again, the charter makes provision
for the complainants to construct a common road or
causeway from Newark to Jersey City, leading up to and
from this bridge, at great expense, across the marshes.
If the term bridge meant a structure without a footway

for man or for animals carrying or drawing their burthens, it would have been a compliance with the charter, if the complainants had built such a structure as the defendants propose to build, and claimed the monopoly for an hundred years. But how is it possible to conceive that the legislature of 1790 could have meant, by the term bridge, a structure which nothing which could come by the road they were to build could by possibility cross? If the defendants' structure, if erected in 1790, would *not* have been a bridge *then,* if erected *now* it could not be, in the language of the 15th section of the complainants' charter, *any other bridge.* The legislature of 1790 knew perfectly well that, by the term bridge, *ex vi termini,* no structure like that proposed by the defendants could be imposed upon them; that no structure could be imposed upon them which was not the continuation of the ordinary roadway, which had not a footway, a horseway, a wagon-way and roadway. They knew perfectly well that, from the earliest colonial records of this and of all the other states, and for a thousand years in England, the simple term bridge stood as a sign for a structure over a river, which furnished a footpath and a horsepath so wide that man and all animals could walk over it, and draw over it all vehicles in ordinary use, and which nature had given them strength to draw. And they also equally well knew that every kind of bridge did and must furnish this footpath or it was no bridge; and all they provided against was, that it should not interfere with the navigation. But the complainants still contend that the defendants' proposed structure is a bridge.

We are asked, as if the question could not be answered, is not a railroad bridge a bridge of some kind or other? The question is best answered by asking another—is not a hippopotamus a horse, a sea lion a lion, a mermaid a maid? and if it is murder to kill a maid, is it not murder to kill a mermaid? If it is unlawful to build a bridge, is it not unlawful to build a railroad bridge? But suppose

we call a railroad bridge a bridge, as the charter of 1790 does not prescribe the kind, they had as much right to build one kind as another, and then if the complainants, instead of building the one they did, should have built such a one as the defendants propose to build, verily the legislature would have done a prosperous business for their day and generation. With the intent to provide for the more easy passage across the river, they would have got a structure which neither man or beast could even get on, much less over, and made a valid contract with the complainants that no other bridge, no other structure upon which man or beast could cross, should be built for an hundred years. Such are the inevitable results of this charter, if in 1790 the term bridge did not mean a structure affording a pathway, a horseway, and a carriageway, or if a structure without either, a mere wire stretched across the river was a bridge, a bridge of any kind or any other bridge. So if we look at the agreement between the commissioners and the complainants, which I am treating as if it were part of the charter. The commissioners thereby grant to the complainants the said bridges to be erected, with the tolls, which are not to exceed for passing the bridge for a single person three cents, man and horse seven cents, horse and chair fifteen cents, wagon and horse and horses twenty-nine cents, wagon and four horses forty-eight cents. Through all this, do they not use the term bridge as a term convertible with footway? For horse and man passing over the bridge, what is that but walking over the footway? For horse and wagon passing over the bridge ten cents. Take away the footway, and what bridge is there to pass over? So strictly is this idea preserved, that there is no franchise of toll given for anything which does not use the footway and roadway as on the ordinary road. Thus toll is given for animals on foot and on animals drawing their burthens, but no toll is given for anything in wagons or that does not actually touch the roadway. Thus, if the wagon

is loaded or empty, whether it has twenty passengers or none, makes no difference in the toll. If a man passes on foot he pays toll, but if in a wagon or other vehicle he pays none. And thus I might go through every clause of not only the charter of 1790 but also the supplements and the agreement. The fundamental idea in all is, that a bridge is the ordinary roadway for man and beast, and only distinguishable from it in that the ordinary roadway rests immediately on earth, while the bridge does not.

I have said that, in technical language, the term bridge has always stood for a structure that had a pathway, a horseway, a wagonway, and a roadway; that in no law paper or document was a structure which had not a footway, as its elemental idea, ever denominated purely and simply a bridge. I shall not enter into detail upon this subject. I would have to transcribe the statutes at large from the times of the great charter. I would have to transcribe the pamphlet laws of this and of all other states from the earliest records. In every general law respecting highways and bridges, in every provision for their erection or repair, in every charter for particular bridges, in every canal charter, in every railroad charter from the earliest times, no structure that has not the footpath for its elemental idea is taken for a bridge. In all it is assumed that there can be no bridge without the footway. What means, in every canal and railroad charter, the provision, that when they pass a public road or through a farm the company shall build a bridge over the canal? Does it not imply, and so has it not always universally been understood, that by the term is meant a structure with a footway? Would the defendants' proposed structure save the company from indictment for a violation of this requirement? I have considered this question as if we should be confined to the meaning of the word bridge in 1790, when it was used. I only did so to be more certain of safe reasoning. It was not necessary in the present instance. It could safely be yielded to the complainants

to take its meaning at the present day. The term bridge, standing by itself unqualified by any other sign, still in all common parlance and in all technical language means a structure whose elemental idea is the footway. Take, for instance, the act of the legislature passed, with respect to this very river Hackensack, on the 17th of March, 1860, *Pam. Laws* 769. The act is entitled, "an act to authorize the building of a bridge over the Hackensack river," and reads as follows : " And be it enacted, that it shall be lawful for the board of chosen freeholders of the county of Bergen to build and construct a bridge across the Hackensack river at the village of Hackensack." And this is the whole act. They prescribe no form of bridge. Could the freeholders save themselves from responsibility by building a structure upon which neither man or beast could get on, much less cross over ? Take the bridge now building under our eyes over the Delaware. The commissioners are authorized to build a bridge. Would they be deemed to have built a bridge if they erect a structure with no covering, no balustrades, no handrails, no floor or footway, with only two narrow iron rails stretching their grand proportions over the river, and nothing below but the rushing waters ? Does this not most conclusively show that the legislature used the term bridge, as one which *ex vi termini* could not exist without the footpath ? But this is only one of thousands to be found in all our pamphlet acts and in every volume of the annual laws of all our states for the last hundred years. You can hardly open a page of any of them but you will find the legislatures using the term bridge as being convertible with the term footway, as calling for a structure affording a footway and a horseway wide enough for them to walk over and draw their burthens over with them. In not one of them, in any state, or from the earliest time to the present moment, is the term bridge, or any bridge, or any other bridge, used to signify a structure which has not the footway. So, again, take up the law reports in

England or in this country.   Bridges have always, from
very early times, occupied more or less the attention of
the courts.   Upon what indictment, in England, has it
ever been a good defence, either by counties or individ-
uals bound to build them, that a bridge was a structure
that did not require a footway, a horseway, and a wagon-
way ?   The same remarks may be made of the reports of
our own country.   I find, indeed, in the early reports no
definition of a bridge any more than I do of light, every
one assuming that everybody knows perfectly well what
a bridge is.   It is always assumed as a footpath across
a river, and to which there is no exception, not even, as I
expect to show hereafter, the Enfield bridge case in 17
*Connecticut.*   So again, if we pass out of the region of
the law, we can collect a respectable library of works de-
voted exclusively to the matter of bridges ; but in none
can you find the slightest hint that a thing without a
footway is a bridge.   I shall not quote definitions from
dictionaries and encyclopedias, but only remark, that they
all define or assume a bridge to be a structure with a foot-
path.

Now bearing in mind that a bridge, by the concurrent
testimony of all past time, in every possible shape and
form, is but the ordinary road carried across the river,
by whatever contrivance supported, what resemblance
has the proposed structure of the defendants to one ?   Is
it any continuance of the ordinary road across the river ?
Could any animal travelling on the ordinary road use it ?
What is its elemental idea ?   Two iron wires stretched
across the river, so narrow and so wide apart as to afford
no footway to man or beast.   Do two wires make any
difference ?   Is not one as good a bridge as two ?   Does
it make any difference whether the iron wires are four
feet or four miles asunder ?   It is true that the defendants
may go on, and by laying plank across their structure,
make a footpath for man and beast, and then it will, *quo
ad hoc,* be a bridge.   They may thus make their structure

not only a bridge, but also a railroad bridge and a railway bridge, and by putting glass supports under the rails, also a telegraph bridge. All these structures may thus be combined in one. A short reference to the history of railways will, perhaps, best illustrate what I mean. Curiously enough, the first railroads ever built were underground railroads, *viz.* those built, in the coal mines of England, to facilitate the miners in drawing their handcars through the low and dark coal galleries to the foot of the shaft. The idea was soon transferred to the upper air. They were first built from the mouth of the shaft to an adjoining harbor, and were at first rudely constructed of timber rails, and drawn by animals, and so, of course, had footpaths. They were the ordinary roadways, except that rails were laid in them. These railroads crossed streams upon structures which necessarily had footpaths, and were properly denominated railroads and railroad bridges. They were roads in respect to their having the ordinary footways for beasts, and railroads in respect to the rails upon them. So structures by which they crossed streams were properly denominated railroad bridges. They were roads in respect to their being the continuation of the ordinary roadways or footpaths, and bridges in respect to their pathways not resting immediately upon the earth, and railroad bridges in respect to the rails upon them. But let the footpath disappear from this structure, and it would neither be a bridge nor a railroad, nor a railroad bridge. It would be a railway pure and simple. It would be no more a bridge than the rest of the distance would be a road, if its bottom should sink out of sight. This is the way in which it has happened that the term railroad bridge has come to be frequently applied to those mixed railroad structures, and is entirely correct when they have the footway. This use of the term has become the more common by their frequently being built in this way. So it is with the railroad bridge over the Raritan at New Brunswick, the wire bridge over

the Niagara, and, perhaps, the Victoria bridge over the St. Lawrence. These structures are not the less bridges because they have also railroad tracks on them, or because cars and locomotives roll over them. That is not the question. The question is not, whether the structure may not be a bridge as well with as without the rails, but whether it can be a bridge without the footway. If a railroad should be laid down in Broadway, New York, it would not be less a road because of the rails and cars. But would it be a road, if the whole bottom of the street should fall out, and leave nothing but the rails and an unfathomable gulf below? It is the mixed structures to which the term railroad bridge has been generally applied, and is, as to them, perfectly correct. But I am not aware that the term railroad bridge has, except in the most loose and casual manner, been applied to a structure without a footway, to a railway pure and simple over a river. If it has, a locomotive has quite as often, and quite as consistently, been called a steam horse, and will prove as logically that a locomotive is a horse, as that a railway bridge is a bridge. Indeed, it appears to me that the steam horse is quite as much a horse as that a railway bridge is a bridge. To be sure he drinks larger draughts of water from his trough; his food is somewhat coarser; the one eats the grass of the field, the other devours the trees of the forest; his neigh is somewhat louder; his heart, as he champs upon the bit to start, is fired by an intenser heat; as the driver gives him the rein, the breath of his nostrils beclouds his pathway, and distancing at a bound his puny competitor, he shouts his challenge to the sun, as over hill and valley, over mountain and prairie, he holds on his tireless flight towards the occido-orient. But this steam horse has no feet, and his bridge wants no foot-path. The bridge is the congener of the horse, and the railway of the locomotive. The bridge presents to terrestrial animals the natural form adapted to their mode of progression; the viaduct to the powers of steam on land,

the material form adapted to its mode of progression ; the telegraph wire to electricity, the material form adapted to its mode of progression; the water to the steam ferry, the material form adapted to its mode of progression ; the canal to the propeller, the material form adapted to its mode of progression. But all these start from different seminal principles of thought, develop themselves into entirely different forms, and have always been distinguished by different verbal signs. The horse and the steam horse are both capable of rapid motion, and that is all they have in common; the bridge and the railway bridge are both structures across rivers, and that is all they have in common ; the railway bridge as far exceeds his rival in the peculiar manifestations of his powers as the steam horse does his rival, and yet falls as far short of the principle of the bridge as the locomotive does of the horse ; the horse has life, and the bridge has bottom ; the locomotive has no life, and the viaduct has no bottom. The bridge was made for the horse, and the viaduct for Behemoth. Take from the one its life, and it is no longer a horse; take from the other its footpath, and it is no longer a bridge. The structure of the defendants might have stood across the Hackensack for a thousand years, and it would have stood in solitude. It would have had no comrade until the steam horse came, and then they would instinctively have known each other.

I have said that no structure over a river which had not a footway for man and beast was ever called a bridge. Such structures are very numerous, and have existed for several thousand years. Take, for instance, the Roman aqueducts, built for supplying their cities with water. They started from high altitudes, and were carried to the cities by gradually descending planes. In their course, they were dug through hills, and carried by arches over rivers and valleys. Some of them are still existing, and the remains of others are scattered over Europe and Asia, from the pillars of Hercules to the stormy Euxine. But

2 x*

they were never called *pontes*. Why not? They were structures across rivers. There were their massive abutments of solid masonry, their long *vistæ* of lofty piers and of springing arches, wide enough and strong enough to carry over them the imperial armies. What was wanted to their being bridges? Clearly only the pathway for man and animals. Put pathways on them, and they are instantly *pontes;* take them off, and they are instantly but *aquæductæ*. So take the structure alongside of the complainants' bridge carrying water into Jersey City. What is wanting to this being a bridge? It is a structure over a river—it rests upon piling. It carries merchandise into Jersey City. Why do not the complainants enjoin it, and force it to pay tolls into their coffers for every gallon of water that passes over it? The only difference between it and the proposed structure of the defendants is, that the one transports merchandise across the Hackensack by the centripetal power of gravity, the other by the centrifugal power of fire. Put a pathway on it, however, and it is instantly a bridge; take it off, and it is none. Again, who ever thinks of calling a canal viaduct a bridge? And yet why not? It has its abutments, its piers, and its arches; but its waters are no footways for man or beast.

Suppose the Morris canal had seen fit to cross the Hackensack upon piers and arches, would the complainants enjoin its canal boats and propellers under the allegation that it is a bridge? And yet why not? Would it not have everything of a bridge except that its waters are not footways? If these two heavy iron wires of the defendants across the stream are a bridge, why are not the telegraph wires a bridge? They are structures across the river, they are suspended upon piling, they do the business of the bridge. The only difference between the two wires of the defendants and the many wires of the telegraph is, that the one expresses man by steam, the other thought by lightning. Some of us are old enough to remember,

that long after this charter of 1790 was passed, but before the days of railways and telegraphs, when an arrival happened at New York, an express was started from Jersey City. Mounted on the fleetest charger that could be had, with his news in his saddle-bags, he started at full speed toward Newark. Arrived at the Hackensack, he stopped a hurried moment to pay his toll, horse and rider, and then again plunged on his headlong course towards the Passaic, rattling along the turnpike, thundering over the bridge, clattering up the pavement, his horse bathed in foam and screaming to the gathering crowds, "I come the herald of a noisy world, news from all nations." On what bridge now does he, this herald, cross the Hackensack? He stops at no bridge; he pays no toll; the contents of his budget, unheard, unseen, flies with electric speed, for weal or woe, around the earth, using the wire for his bridge, and the lightning for his courser. But why is not the telegraph wire a bridge within the argument of the complainants? It is a structure across the river for the more convenient passage of mail matter. The mail only carries signs, and so does the telegraph. Neither are ponderable, and yet both are conveyed in material matter. The telegraph bridge, like the railway bridge, detracts from the tolls of the bridge. But for it, the express horse and his rider would still have to speed it along the turnpike. Furnish a footpath to the wires, and they are instantly a bridge; but without it, transport across them what you may, by what power you may, steam or electricity, and it never can be such. The bridge is the conception of a structure adapted to the natural modes of locomotion of man and his co-terrestrials, and when we have the superb structures of Roebling and of Stevenson, with their footpaths and rails, and cars drawn by horse power, we have the extreme limits of its growth—it has reached the highest point of development permitted to it by the inexorable law of its existence. It is necessarily limited to short distances, to slow motions, to small loads,

and to the puny efforts of mere animal powers.   But in the railway bridge and the telegraph bridge man frees the latent forces of nature, and harnesses their exhaustless powers to his car.   And yet it is true that the viaduct is a structure more simple than the bridge, and the telegraph than either.   But such is the law of progress. As man penetrates into the arcana of nature; as, through long series of ages, he laboriously and slowly, at infinite distance, but by infinitessimal approaches, advances himself toward the presence of Omnipotence; as results become sublime means become simple.   Stone—Bronze— Iron—Bridge—Viaduct—Telegraph.   That slender wire, so fragile as if the robin's tread might part it, nothing, unless insulated from earth, do we in blindness touch a chord by which Omniscience sends his mandates through the universe!   The viaduct and the telegraph are no children of the bridge.   They are born of thoughts mightier far than it—steam and electricity!   The one, the highest type on earth of infinite power, the other of infinite speed.   The railway bridge and the telegraph bridge!   But bridges *only*, as the waters of the ocean are a bridge for leviathan, and the air a bridge for the eagle.

I shall now review the authorities cited upon the argument, but shall first refer to one, I believe not there cited, *viz.* that of *The Freeholders of Sussex* v. *Strader*, 3 *Har.* 112.   It appeared, by the case, that as Strader was driving carefully over a bridge, the abutment of which was defective, one of his horses fell off, and was killed. The question was, whether the chosen freeholders or the overseers of the highways were responsible.   Justice Dayton, in delivering the opinion of the court, says, "the term bridge conveys to my mind the idea of a passage way by which travellers and others are enabled to pass safely over streams and other obstructions.   A structure of stone or wood, which spans the width of the stream, stretching its gaunt proportions from waters' edge to waters' edge, but which is wholly inaccessible at either

end, whatever it may be in architecture, does not meet my ideas of what is meant in law and common parlance by a bridge." But if instead of the *abutments merely* being defective, Justice Dayton had looked upon the defendants' structure, stretching its gaunt proportions from waters' edge to waters' edge, consisting of only two wires four feet and ten inches asunder, and nothing between them, with no footway, no horseway, and no wagonway, is it not apparent that it is the last thing that would have met his ideas of a bridge ? Justice Dayton then proceeds : " From the time of Leaming and Spicer, the books literally teem with enactments about roads and bridges. The legislation of the state affords many instances where companies and individuals are either bound or authorized to construct bridges, and in such cases the word bridge is used as tantamount to a complete passage way. It has never been doubted that when companies have been required to construct bridges over canals or railroads, that they were bound to fill up the ends, so as to make complete and safe passage ways for the public or the owners of adjoining land. So, too, our statutes have authorized owners of land to construct bridges over private or byroads, over drains and ditches; and under this phraseology, it has never been doubted that the owner is bound to fill up the ends of these bridges, so far as to make them safe and convenient passage ways." White and Nevius, justices, concurred in all things with Justice Dayton. Chief Justice Hornblower says, " I fully and in all things concur in the opinion just delivered by my brother Dayton." This definition of a bridge, as contained in the opinion of Justice Dayton, has since got into the law dictionaries, Bouvier expressly founding his definition of a bridge upon it. Can any one read this opinion, and for a moment think that if the Supreme Court, in 1840, had looked upon two naked iron rails stretching their gaunt proportions from waters' edge to waters' edge, with no footway, no horseway, no wagon-

way, and no roadway, from which a horse could not fall off, *only* because he could not get on, that they would have called it a bridge?

The next case in the order of time, and the first one cited on the argument, is that of *The Mohawk Bridge Company* v. *The Utica and Schenectady Railroad Company*, 6 *Paige* 564. This was in 1837. The railroad company were proceeding to erect their structure for the passage of railroad cars about one hundred rods above that of the Mohawk bridge, and the complainants filed their bill, stating, among other things, that the proposed railroad bridge would divert travel from the toll bridge. It will be recollected that, before this decision, the courts of New York had always held that the grant of a toll bridge franchise was by its very terms exclusive, and so in this case the Mohawk bridge had contended. It will be perceived, therefore, that for the purposes of the argument, it made no difference whether there were express words of exclusion in the grant to the bridge company or not, and therefore the Chancellor said, " the legislature have not deprived a future legislature of the right to authorize the erection of another bridge. And even if the grant had in terms given the exclusive right to erect a toll bridge, the subsequent grant to the railroad to cross the river with their railway would not have been an infringement, as the railroad bridge would not be a toll bridge within the meaning of the grant." The case of *The Charles River Bridge* v. *The Warren Bridge*, 11 *Peters' Reports*, had not been reported when this opinion was written, as it is not referred to either in the opinion or upon the argument.

The Chancellor had, therefore, two questions directly before him: one was, whether a grant of a toll bridge was *ex vi termini* exclusive, the other was, whether a railroad bridge was a toll bridge within the meaning of the grant. If he proceeded upon the first question, he must overrule a series of decisions in New York, for which the Charles

river bridge case had not yet led the way, and he therefore chose to put his opinion upon both grounds, holding —first, that a grant of a toll bridge was not *ex vi termini* exclusive; and in the second place, that a railroad bridge was not a toll bridge. It appears to me, therefore, that the Chancellor's opinion on this last point is not justly subject to the criticism that it was a mere *dictum;* but the question laid plainly in his path of argument, and demanded a solution, unless he was satisfied to overrule the current of previous decisions of his own state, and rest the case entirely on that. He refused the injunction, upon the ground that a railroad bridge was not a toll bridge, as well as upon the other ground.

The next case, in the order of time, is that of *The Enfield Toll Bridge Company* v. *The Hartford and New Haven Railroad Company,* 17 *Conn.* 56. This was decided in June, 1845. As this case was greatly relied on at the argument by the complainants, and some surprise expressed that it is not adverted to in the opinion of the Chancellor, I shall consider it with some particularity. The legislature of Connecticut, in 1798, had authorized the complainants to erect a bridge over the Connecticut at Enfield, with power to collect tolls for an hundred years. The charter further provided, that no person should have liberty to erect another bridge anywhere between the north line of Enfield and the south line of Windsor. In 1835, the legislature chartered the defendants, and gave them power to construct a railroad from Hartford to Springfield, and, if necessary, to build a railroad bridge over the Connecticut. The railroad having commenced to build their bridge within the forbidden limits, the bridge company applied for an injunction.

The Chief Justice, in delivering the opinion of the court, says: " The defendants claim that they have a grant to lay a railroad or way to cross the Connecticut river; that this structure over the river is part of their railway, and not a bridge, in the sense of the charter. What, then,

is a bridge? It is a structure of wood, iron, brick, or stone, ordinarily erected over a river, brook, or lake, for the more convenient passage of persons or beasts and the transportation of baggage." Taking this definition to be entirely accurate, the misfortune is that it does not embrace the proposed structure of the Hoboken Land and Improvement Company. They propose to erect no such structure. In the first place, is the structure they propose to erect one "ordinarily erected for the more convenient passage of man and beasts." The definition evidently never was intended to refer to any such structure as the defendants propose to erect over the Hackensack. The structure ordinarily erected over a river for the more convenient passage of man and animals, is one having *something* man and animals may walk over, a *footpath.* A bridge erected for the more convenient passage of man and beast, which had no bottom to it, which was in fact nothing more than two telegraph wires stretched across the river, would, I think, to the man and beast which came to make a more convenient passage, appear not an ordinary, but a most extraordinary structure for that purpose. But that the Chief Justice is reasoning about a very different structure from that proposed by the Hoboken company is manifest, for he immediately adds as follows: "And whether it is a wide raft of logs floating upon the water, and bound together with withes, or whether it rests on piles of wood, or stone abutments or arches, it is still a bridge." All this is true, and indeed I do not know anything that gives a better footway for man and beast than a wide raft bound together with withes. But a horse or a horse and cart, I take it, would find it a very different thing to cross the Connecticut on two telegraph wires four feet ten inches asunder. The Chief Justice then remarks: " The particular manner in which this structure is built is not described, but it is said to be much in the manner common to railroad bridges, *the bottom covered with plank,* and the sides secured by railing."

It seems hardly worth while to proceed with our criticism of this opinion of the Chief Justice of Connecticut, after he has told us that the structure he is trying to prove to be a bridge has its bottom covered with plank. By that simple statement, he gives us a structure with a pathway, a horseway, a wagonway, and a roadway. He even adds the handrails. He can have no difficulty after this in proving his structure a bridge. But the question is, not whether it would be a bridge with its bottom covered with plank, but whether it would be one *without* it. Leave its bottom covered with plank, and it will no more cease to be a bridge because rails are laid in it, than Broadway will cease to be a street, if rails are laid in *it*. But take the bottom out of both, and the Chief Justice's structure will no more be a bridge than Broadway will be a street. The structure the Hoboken company propose to build is precisely the opposite of that 'about which the Chief Justice is reasoning. The one has a bottom, the other has not. The Chief Justice then again proceeds—"It is a matter of notoriety that railroad bridges are built upon solid abutments of mason work, and resting on piers of stone between the abutments, thus giving security and strength to the frame above." And he adds—"It is not easy to see wherein such a structure differs from an ordinary bridge, except that, as it is to endure a greater burthen, it is more solid and substantial." Nor, as I frankly confess, can I, with its solid foundation and its bottom covered with plank! The brethren of the bridge, with the sovereign pontiff (Pontifex Maximus) at their head, could not have built a better. But the question is, if the learned Chief Justice of Connecticut had stripped the plank from off the bottom, and undertaken to walk, Blondin like, upon one of these iron ropes over the dizzy waters, whether he would *then* have seen no difference, and would have said judicially, that *that* was a structure ordinarily erected over a river for the more convenient passage of men and animals. The Chief Justice then

proceeds—"It would seem, therefore, as if this was what would be ordinarily called a bridge." He need not have qualified the sentence with a "seem." There was nothing ever more absolutely certain than that a structure upon piers and abutments, with a pathway of solid plank resting on them, is a bridge. The Chief Justice then proceeds as if not yet certain that a roadway resting upon solid piers is a bridge, and remarks—"But we agree with the defendants' counsel that it is not the name that is sufficient to designate it." Here he recognises the principle we have before enunciated, that the calling a structure a railroad bridge will not make it a bridge, any more than calling a locomotive a steam horse will make it a horse.

He then again proceeds—"We must then consider the object. What was the intent of this structure?" I had supposed that this was a question of essential structure, a question what material thing was represented by the sign bridge, and I confess I am unable to see how the object and intent with which a man builds a thing can make it either a bridge or a horse. But the Chief Justice, nevertheless, answers his own question himself, and thus gives us its object and intent: "The safe and expeditious passage of persons, whether from greater or less distances, over the stream, in the cars or carriages provided for that purpose, together with all baggage or freight intrusted to the care of the company." Now that he correctly states the object of the railroad structure is most true; but that a bridge ever had such an object or intent I have first learned from his enunciation. Will any one produce an instance? *When*, where, in what country, in what age, in what case in England, where tolls are sometimes attached to the servitude to build, in what act of parliament, in what charter of the crown, in what act of incorporation in this country, in what bridge built by state, county, or private person or public corporations, was ever the safe and expeditious passage of persons over the stream in the

cars provided for that purpose, together with all baggage or freight, intrusted to the care of the company, the object and intent of a bridge. On the contrary, it is just this object and intent which bridge builders never could have had. Who ever heard of a bridge owner furnishing or being obliged to furnish cars or carriages to transport passengers and freight across his bridge? It involves loading and unloading freight and passengers on each side of the river, and the whole idea is incongruous with this mode of structure. But there is no case I have seen (the proprietors of the bridges over the Passaic and Hackensack certainly cannot) where bridge builders can charge for freight and passengers so transported. They are not among the things to which tolls attach; so that if the intent and object of a bridge be as supposed by the Chief Justice, those who build bridges for the public use must have the benevolent object and intent to build them at their own cost for nothing, and provide the cars and motive power extra and gratis. The Chief Justice has fallen into this expression by not adverting to the different senses in which the word passage is used in reference to crossing a stream. Wherever, in the dictionaries or encyclopedias, or in statutes, the word passage is used in reference to a bridge, it is used in its active sense, as when a man walks over a bridge he is said to pass over a bridge, and is called a footpassenger; when the term passage is used in crossing a river upon a structure not a bridge, the term is used in its passive sense, as when a man passes over the ocean to Europe in a ship, or if he crosses over a river in a canal boat, or in a ferry boat or a railroad car. In all these cases it is called a passage, but the term is then used in its passive sense. If he or any other animal goes over a bridge, he goes by his own powers of locomotion; if he goes on a boat or a railroad car, he is carried by others. A want of advertence to this distinction has caused, I apprehend, much of the confusion upon this subject. The Chief Justice, again speak-

ing of the railroad structure, says: "It may not, and it is not intended to accomplish all the objects of a common bridge, as it is not adapted to the common vehicles in use;" but, he adds, "can that fact change its character as a bridge?" It is apparent that the Chief Justice has gone on with his reasoning until he has forgotten his own definition. He had just before told us that a bridge was a "structure *ordinarily* erected over a river for the more convenient passage of persons or beasts and the transportation of baggage." How a structure not adapted to the common vehicles in use can be one *ordinarily* erected over a stream for the more convenient passage of persons, is more than I can see, and is a fact which I have never observed. But the Chief Justice asks the question as if it was conclusive upon this point, "Can the fact that the structure is not adapted to common vehicles change its character as a bridge?" I answer, most certainly not. If it is a bridge at all, no fact can change its character as a bridge. In pursuing his argument, he next remarks, "A bridge adapted only to footpassengers would be still a bridge." A bridge adapted only to footpassengers is undoubtedly a bridge, and was probably the first one ever built. But how it follows, that because a structure adapted to only footpassengers is a bridge, that therefore a structure upon which a footpassenger can neither get, stand, or walk, is a bridge, is a sequence which I cannot see. The Chief Justice proceeds: "And it would hardly be claimed that such a bridge, to wit, one with a footpath, might be erected by the side of the plaintiffs' under the provisions of their act." In this I entirely concur. But the Hoboken Land and Improvement Company propose to erect no such footway; and if they do, they will, under the assumptions I am considering this case, become responsible.

The Chief Justice then remarks: "We find, then, this structure, with the form of a bridge, with the name of a bridge, with the character of a bridge, and doing the

work of a bridge; we cannot, then, but conclude that it is a bridge." This may all be very good logic as applied to the structure the Chief Justice has built in his own contemplation; but it has no application whatever to the proposed structure of the defendants in this cause. A structure without a footpath for man and beast has neither the form of a bridge, the name of a bridge, the character of a bridge, nor does it do nor *can* it do the work of a bridge. As to its form, no bridge was ever built that had no bottom to it. Two wires stretched across the stream has not a single characteristic of the form of a bridge. It is no more a bridge than a sieve is a pail—the one will no more carry passengers than the other will carry water; nor, as we have seen, had such a structure ever the name of a bridge. I do not know if I understand exactly what the Chief Justice means by the character of a bridge, but I have never learned that two wires stretched across a stream without any pathway for man or beast ever enjoyed such a reputation. Nor can such a structure by possibility do any of the business of a bridge. What business that a bridge ever did in all time past can by possibility pass over or be done upon the proposed structure of the defendants? The only business of a bridge is the passage of men and animals upon its footpath drawing the ordinary vehicles. This the defendants' structure cannot do. Nor can the bridge do the business of this viaduct—and if it did, it could charge no toll for it. This structure of the defendants does the business of the bridge only in the way a ferry or canal boat would do it. It bears more resemblance to the ferry than the bridge. In the ferry the passenger is buoyed up by the boat, in the viaduct by the rails, on the bridge by the footpath. On the bridge he passes over by his own active motions; on the viaduct and the ferry he is passed over in the boat or car of the company. The ferry boat is kept to its course by the helm, and the car by its flanges. It is true a man may pass over the bridge in an

omnibus, but then he is an omnibus, and not a bridge passenger. The bridge toll is the same if there be one or twenty passengers in the omnibus; the toll charge is for using the footway. We cannot, then, but conclude that the proposed structure of the defendants is not a bridge. The result in Connecticut was *en rapport* with the reasoning. The court enjoined the *railway* bridge, not because it had *rails* upon it, but because it had a *footpath* upon it. I conclude that this case in 17 *Connecticut* proves nothing. The structure about which the court reasoned being one the very reverse of that the defendants in this case propose to erect.

The next case in order cited on the argument is that of *Thompson* v. *The New York and Harlem Railroad*, 3 *Sand. Ch. R.* 625. This was in 1846, one year after the preceding case, but which is not referred to, it being then not yet printed. This last case was this : the legislature of New York, on the 31st of March, 1790, gave to Lewis Morris the right to build a bridge across Harlem river; and by the same act it was provided that it should not be lawful for any person whatsoever to erect any other bridge over said river, except for the private use of the inhabitants of the townships of Harlem and Morrissania. Morris erected the bridge, and his rights were held by the complainant. It will be observed that this act was only a few months before the one of the complainants in this cause, and is identical in language, as if the one had been copied from the other. In 1837, the inhabitants, under the above reservation in their favor, built a new bridge over the Harlem, and on the 10th —— 1840, sold it to the defendants, reserving to the inhabitants of Morrissania their rights. The defendants, having a legislative grant to build a railroad bridge over the Harlem, laid the track of their railway on the floor of this bridge, and it became a part of their railroad from New York to Westchester. The bill was to enjoin the railroad company from using it for their cars, upon the allegation that such use in-

fringed the franchise given to Lewis Morris in 1790. The Vice Chancellor refused to restrain the defendants from using their structure as a railroad bridge. It was said here, upon the argument, that the Vice Chancellor put the case upon the ground that no exclusive right was given. It does not appear to me that it is obnoxious to this criticism. The Vice Chancellor does indeed say *arguendo,* "that the legislature do not declare that they will not permit another bridge to be erected," meaning merely that although the legislature say that it shall not *now* be lawful to erect a bridge, yet they do not say that they will not make it lawful *hereafter.* But the language of that exclusive grant is identical with that now before the court, and the Vice Chancellor goes on afterwards, and meets the whole case. He finally put the case expressly upon the ground that "the progressive spirit of the age had developed and matured a mode of conveying passengers and freights from place to place across rivers which was unknown in 1790." This could hardly be said if he had deemed the defendants' structure a bridge. The next case in the order of time is that of *McRee* v. *The Wilmington and Raleigh Railroad Company,* 2 *Jones' Law R.* 186. This was so late as 1855. The legislature of North Carolina, in 1766, authorized one Harren to build a bridge over Cape Fear river, and provided therein that it "should not be lawful for any person whatever to build any bridge within six miles of the same." The defendants pleaded that they had a charter to build a railroad over this tract of country, and that they erected the bridge complained of as part of their road. It has been objected to in this case that the court put it upon their bill of rights. I think, however, a careful examination will show that this was not exactly so. The North Carolina court appears to have been puzzled in the first place as we have been puzzled, with a syllogism. The complainants' counsel argued thus : The legislature have prohibited the building of any other bridge ; a railroad bridge is a bridge : therefore a

railroad bridge is prohibited. The syllogism being perfect, the court at first appear to have got a little excited at the audacity of the pretension, and said "it was unreasonable;" but being too good logicians not to see that that was no answer, they returned, determined to attack the syllogism in due form. Their first assault was upon its first member. They said the prohibition against building any other bridge was against their declaration of rights. But here again, as lawyers, not seeing very clearly how a man could get rid of an honest contract by a mere declaration of his rights, with true southern gallantry, they again return to the charge, determined this time to bring their logical batteries to bear upon the second member of the syllogism, *viz.* that a railroad bridge is a bridge, and to attack the enemy with his own weapons. The final result was pronounced in the following words : " We are not now to decide whether the franchise or monopoly was entirely abolished by the declaration of rights. It may be that the franchise still exists, possibly so far as to prevent any other person from setting any person or thing over the river in the way of an ordinary bridge. That is a different question. *We decide now,* that notwithstanding the exclusive grant, the legislature had the power to grant to the defendants the right to construct a railroad, and in so doing to cross Cape Fear river, and consider ' *the transit* ' over the river as a part of their road." And so the plaintiffs lost their case because the court persisted in calling a railroad bridge a *transit* instead of a bridge, and had, consequently, to suffer a nonsuit; so that this case is not justly obnoxious to the criticism that it was decided upon their bill of rights. On the contrary, the court put their decision expressly upon the ground that the railroad bridge was no bridge, but only "a transit." Their decision was, that that railroad structure, however called, was no bridge. The next case having reference to the the term bridge, but which was not cited on the argument, is that of *Tolland* v. *Willington,* 26 *Conn.* 578, in

which Judge Ellsworth, in delivering the opinion of the court, says, " a bridge is considered to be a pathway for travelling over a stream of water." He also cites with approbation the case of *The Freeholders of Sussex* v. *Strader*, 3 *Har.* 108, and also the definition in Brand's Encyclopedia, which defined a bridge to be " a structure for the purpose of connecting the opposite banks of a river by means of certain materials forming a roadway from one side to the other." The only other case I shall refer to, which also was not cited on the argument, is that of *The Cheshire Railroad* ads.        1 *Foster's (N. H.) Rep.* 29. This was in 1850. The legislature of New Hampshire, in 1783, granted to Enoch Hale the exclusive right of building a bridge over the Connecticut, within certain limits, and of receiving tolls thereon. The bill was filed by those holding Hale's rights against the defendants, to restrain them from building their railroad bridge within the prohibited limits, and the question was whether that was a good defence; and the court, although they, as well as the counsel, reasoned very loosely upon the subject, decided " that the specific differences between the two structures might be so great that the one might not be considered as infringing upon the province of the other." So that all the authorities, whether cited on the argument or which I have met with otherwise, look to nothing as a bridge which has no footway.

*Thirdly.* But suppose this structure of the defendants will be a bridge within the meaning of the act of 1790, would it interfere with any of the franchises of the complainants? The ground upon which the injunction is allowed, if allowed at all, would be, that the complainants' franchises are property, and that the defendants sought to condemn them without compensation.

The franchises of the complainants are to build a bridge over the Hackensack, use it themselves, and collect tolls from others, and prevent anybody else interfering with these tolls by building any other bridge. The complain-

ants' franchise of building a bridge is not proposed to be interfered with nor the free use of it by themselves.    If there is any interference, it must be by diminishing their tolls by means of the bridge to be erected by the defendants.    The franchise of the complainants is to collect tolls of men and beasts, when they pass over the bridge, also of beasts, when they draw burthens after them.    But suppose the defendants should come with their locomotives and cars to go over the complainants' bridge, there is no franchise to collect tolls of them.    If they should come with a car drawn by one horse, they could demand ten cents toll.    But they have no franchise to demand toll if it comes with a locomotive, unless they make the same syllogism with respect to the locomotive that they do with the bridge, *viz.* as follows: the complainants have a franchise to charge toll on a horse; a steam horse is a horse, therefore they have a franchise to charge toll on a steam horse.    Passengers in the cars cannot be charged any more than if they had passed in an omnibus, and it is the same with freight.    The defendants' franchise is to collect tolls from passengers and freights passing in their cars, so that the franchises of the plaintiffs and defendants are entirely distinct.    The plaintiffs have no franchise to collect toll on anything that passes or can pass on the defendants' structure.    This question was discussed and decided in the case of *Thompson* v. *The Harlem Railroad*, above cited.    The same point was ruled the same way in *The Stourbridge Canal Company* v. *Whaley*, 2 *Barn. & Ad.* 792, and in the case of *Perrine* v. *The Chesapeake and Delaware Canal*, 9 *Howard* 192.

But, again, all legislation in England and in this country has always proceeded upon the assumption, that the right to build a bridge and the right to build a railroad or a railway bridge are different and distinct franchises, and everybody has always acquiesced in the distinction.    Who would or has even *thought* of building a railroad bridge under a franchise to build a bridge, or *vice*

*versa?* or to build a road under a franchise to build a railroad, or *vice versa?* No terms have ever been kept in all legal language more distinct, and better practically understood, than a road and a railroad, or than a bridge and a railroad bridge, and much more is a *railway* bridge pure and simple an entirely different thing from either.

But it has been contended that, whether the complainants have any rights or not, whether any franchise of theirs is proposed to be taken or not, that the defendants are bound to have commissioners appointed to determine whether the defendants wish to take any franchise of the complainants, what that franchise is and what it is worth, and that this court should enjoin them until they do so. This is claimed under the 1st, 5th, and 6th sections of the defendants' charter, *Pam. Laws* 1860, *page* 213. By said first section it is enacted, that the defendants shall have power to build a railroad from Hoboken to Newark, with power to erect the necessary viaduct over the Hackensack river, reserving to the complainants their right of compensation under the 5th and 6th sections of the act. By the 5th section it is provided, that if the defendants fail to agree with any corporation owning or *claiming* to own any franchise, application shall be made in writing, by the defendants, for the appointment of commissioners, who shall examine into the matter, and report what (if any exist) franchises are necessary to be taken; that such application shall be made to the Chief Justice, setting forth what corporations the defendants are informed claim some franchise for which compensation may be asked; which commissioners shall meet and proceed to view and examine the matter, and report in writing what (if any exist) franchises are necessary to be taken, and make a just assessment of the value of (if any exists) the franchise so necessary to be taken, and assessment of the damages for the same.

Now the first section does not except from the defendants' grant the power to build a viaduct, unless

upon the payment to the complainants of the value of their bridge, but only the complainants' right to compensation under the 5th and 6th sections of the defendants' act. We, of course, must refer to these sections to see what these rights are. Upon such reference, we perceive that those rights are compensations only for franchises *taken*, not for franchises merely *claimed*. To come, therefore, within the reservations of the 5th and 6th sections, the complainants must show a franchise taken, or, in other words, must show that this viaduct is a bridge, and that they themselves have a franchise to charge tolls on passengers and freight in cars drawn over structures which are not bridges; therefore this question is not affected, one way or the other, by this reservation in the first section.

But the complainants contend, in the next place, that, by the 5th section of the act, whenever the defendants are informed that some corporation *claim* some franchise for which compensations may be asked, they shall apply for commissioners to examine the matter, and report what franchise is necessary to be taken, and its value, and that unless they do so in every case of claim this court will enjoin them. It is apparent, from the whole scope of these 5th and 6th sections, that their only object was to give power to condemn franchises which the defendants wanted to take, and to restrain them from taking more than was necessary, and *not* to enable the complainants to force the defendants to take their franchises, whether the defendants wanted them or not. Here the defendants do not wish to condemn any of the complainants' franchises. They do not want them at all. If they should want them, they are authorized to take them in the mode prescribed in their charter, and *then* they must call the commissioners; but until they do so want them, it was not the intent of the charter to force them to do so. It is true, that if the defendants undertake to infringe upon or use the complainants' franchises without a compensation this

court may restrain them, but then it will be under a *right* shown by the complainants to the franchise the defendants propose to use, and not to a mere *claim* to the franchise.

What would be the result if we should, when it is apparent to us that the complainants have no franchise which the defendants propose to use, enjoin the defendants? It is manifest that the defendants never could build their road, however clear their right to do so might be. It is as easy for one person to make a false claim as another; and as soon as the commissioners and the jury on appeal have disposed of one, another may be started, and so on *ad infinitum.* And every false claim must be alike protected under the wings of the Court of Chancery; and the time of this court would be occupied in forcing one person to take property, who admits that he does not *want* it, in order to compel him to pay its value to another, who admits that he does not *own* it.

I am of the opinion—first, that the proposed structure of the defendants is no bridge of any kind whatever as the term bridge is used in the charter of 1790; and secondly, that if it were such bridge, that the franchises given to the defendants by the act of 1860 are entirely different franchises from those given to the complainants in their charter of 1790 ; that the railway franchise given by the act of 1860 to the defendants is no more a bridge franchise than it would be a steam ferry franchise, a canal franchise, or a telegraph franchise, and that the decree of the Chancellor should be affirmed.

OGDEN, J. A chronological statement of the statutes from which the parties derive their rights, with particular references to the sections thereof relied on by them, respectively, are necessary for an intelligent determination of the points in issue in this cause.

On the 24th of November, 1790, the Council and General Assembly of this state, for the purpose of advancing

the public good by the substitution of bridges for the then existing ferries, as declared in the preamble, passed " an act for building bridges over the rivers Passaic and Hackensack, and for other purposes therein mentioned."

By the first section thereof, five persons were appointed a board of commissioners, " fully authorized and empowered to put into execution the several services intended by the act." By the third and fourth sections, the commissioners were authorized to erect, or cause to be erected, a bridge over the Passaic river and a bridge over the Hackensack river, at places within specified limits, that might seem to them " most suitable and convenient for the purpose, having due regard to private property as well as to the public good."

The 10th section provides, that the bridges so to be erected shall be and thereafter remain toll bridges : and it empowers the commissioners to let the bridges to farm to other persons to be erected and made, and afterwards to be kept in good repair and maintained by the toll arising therefrom ; and it authorizes the commissioners or persons farming or having care of the bridges, or either of them, to demand and receive toll within such fixed rates as the commissioners should appoint and direct in writing should be paid from all persons passing over the same.

The 11th and 12th sections provide that, " in order the better to carry into execution the ends proposed by the act," the commissioners should have power, at their discretion, to contract and agree with any person or persons, who would undertake the same for the tolls, or for so many years, and upon such conditions as to them should appear expedient; and when such a contract should be signed, sealed, and delivered in conformity with the act, that it should be so binding upon the state, and as effective to all intents and purposes whatsoever as if it had been particularly and expressly set forth and enacted in the law.

By the 15th section it is enacted, " that it shall not be

lawful for any person or persons whatsoever to erect, or cause to be erected, any other bridge or bridges over or across the said river Passaic, at any place or places between the mouth of the said Passaic river and the place where the brook commonly called Second river now empties itself into the said river Passaic; nor shall it be lawful for any person or persons whatsoever to erect, or cause to be erected, any other bridge or bridges over or across the said river Hackensack at any place or places between the mouth of the said Hackensack river and the place where Kingsland's creek empties and discharges its waters into the said river Hackensack."

Each bridge is declared, by the 17th section, to be a public highway for all people of the United States to pass over on the payment of the rates; and it is therein required that after a bridge should be erected, good attendance should be given at all times at the same; and that every and all person or persons should be suffered, with their goods and chattels, to pass peaceably and quietly unmolested over the bridge, having first paid the prescribed toll.

In the concluding proviso of the last section of the bill, it is enacted that the bridges to be built by virtue of the act shall continue the property of the persons therein mentioned, their executors, administrators, or assigns, for the term of twenty-nine years from the time of passing the act, and no longer.

The commissioners, under the provisions contained in the 11th section of the act, which were merely auxiliary to the main design thereof, on the 19th of February, 1793, made and executed with certain individuals, under hands and seals, a contract for constructing and maintaining the two bridges, and thereby did vest in the said farmers or grantees the powers and privileges which were conferred upon the commissioners for erecting bridges of a peculiar construction and description, together with the right of taking certain fixed tolls thereon; to have and to hold

the said bridges, with their respective tolls and profits, to them and their representatives for the term of ninety-seven years.

On the 5th of November, 1794, upon the petition of the said farmers, the legislature extended the time for completing the bridges for the term of six months beyond the limit fixed in the original act.

By an act passed on the 7th of March, 1797, after a bridge had been erected over each of the rivers, the grantees and their assigns (called stockholders for building the bridges) were created and constituted a body politic and corporate, for the term that they were entitled to hold the said bridges, by the name of "the Proprietors of the Bridges over the rivers Passaic and Hackensack;" and the stockholders thereof have since that date conducted their business in the corporate name. The charter of incorporation created no additional powers or privileges which can affect the questions presented on the bill and answer in this case.

There cannot be a doubt, upon a fair reading and construction of the 12th section of the act of 1790, but that the contract or lease entered into by the commissioners with the parties thereto of the second part was as valid and binding on the state of New Jersey as if it had been particularly and expressly set forth in the law itself, and been enacted as a part thereof.

The complainants thus becoming, on the 7th of March, 1797, and thence continuing in their corporate capacity, the parties beneficially interested in and entitled to the enjoyment of the rights and franchises granted by the commissioners to Samuel Ogden and others, they are in a position to hold the state of New Jersey to an observance of the contract thus made by the commissioners under their authority, and to claim the protection of the constitution against its obligation being impaired by any subsequent legislation.

Before proceeding further in the historical statement,

it is important to ascertain the duties prescribed and the powers, rights, and franchises vested by the act of 1790, and the contract made in conformity with its provisions. The paramount object of the act clearly was the advancement of the public convenience of travel, by the substitution of bridges for ferries over the two rivers; and the duty imposed by the commissioners upon their grantees, and their representatives and successors, was the erecting and maintaining a bridge of peculiar construction over each of those rivers, suitable for the accommodation of the ordinary means of transit between Newark and Hudson's river, known and used or contemplated at the time.

No individuals would then be expected to undertake the construction of such public facilities at their own expense without having the prospect of a remunerating benefit; and hence, as an inducement for wealthy men to undertake the needed improvement, the legislature offered to capitalists the right of demanding and taking toll, and guarantied the continuance of that right for the period of ninety-nine years; and they contracted to protect the enjoyment of it by excluding, in express terms, all interference within fixed distances on each river. The obligation between the state and those who might accept its proffered terms was mutual; the one, to provide and maintain specific facilities for accommodating the public, at all times, with convenient and unmolested passages over each of the rivers; the other, in consideration of the duty assumed, to secure, as a recompense therefor, a toll from persons using the bridges, and to protect the right of exacting it, by forbidding all erections which would be calculated prejudicially to draw away the custom from which the benefit was to be derived. Grants of this nature should be so construed as to save the holders of the estate in them from such contiguous competition as would *operate fraudulently on the grant.* Such is the doctrine of the common law; and the American practice of exclud-

2 z*

ing by legislation all interference within specified distances is in affirmance of the common law principle.

There are three distinct features in this act for building the bridges : *First,* a grant of a power coupled with the imposition of an expensive duty—the erection of the two bridges. *Second,* a grant of a franchise—the privilege of exacting toll from travellers. *Third,* a guarantee of the unmolested enjoyment of the franchise for the period of ninety-nine years, by providing that it should not be lawful for any person whatsoever to erect any other bridge over or across either of the said rivers within fixed limits. The power of building and maintaining the bridges is not a franchise, nor is the prohibition of other bridges a franchise. The only *franchise* in the grant is a right to demand and receive toll from all persons who should pass over the bridges required to be erected .during the period that they were to continue to be private property. None of the subsequent acts of the legislature, respecting the bridge company and other incorporated companies, have changed the nature of that *franchise;* nor have the grantees from the commissioners, or their assigns, or the complainants themselves, as a corporation, by acts either of omission or commission, impaired any of the original privileges. In the language of the Chancellor, which expresses my views better than any words would that I could select for myself, I am prepared to say, that " I entertain no doubt that all the rights and privileges conferred by the act of 1790 passed under the contract of the commissioners to their lessees, not by the terms of the contract, but by force and operation of the law itself; that they continued in the company under their act of incorporation ; and that they are now, for aught that appears in this case, in the complainants as fully and effectually as they were originally conferred by the act, except so far as they have been parted with by the voluntary act of the corporation."

In further investigating this case, it is important that

we preserve a clear notion of the distinction between the bridges, which are permanent and substantial objects of sense, and the right to take toll, which is a contingency springing out of the bridges, and supported by them. If we confound together the profits produced and the substantial thing which produces them, we will lose the proper idea of *franchises*, and may fall short in applying to this case the law which regulates *their* enjoyment.

Having shown that, by a valid contract with the state, which cannot constitutionally be impaired, the complainants have the right of maintaining one bridge over each of the rivers Hackensack and Passaic until the year 1889, and the exclusive franchise of taking such tolls thereon as are fixed and specified in their grant from the commissioners, it remains for us to inquire whether the bill and answer show that the defendants are attempting to violate any of the vested rights of the complainants.

The bill states, that by virtue of an act of the legislature, approved on the 8th of March, 1860, the defendants are about constructing a railroad from Hoboken to the city of Newark; and that, on the 15th of May last, they determined upon a part of the route and location of their road, and have deposited a survey thereof in the office of the secretary of state; and that the survey describes the route as crossing the Hackensack river, between its mouth and the place where Kingsland's creek empties into the said river, and within the limits designated in the 15th section of the act of 1790; and that, without obtaining any consent therefor from the complainants, or paying or tendering to them any compensation or damages for the violation of the contract, the defendants have commenced building a bridge on the eastern shore of the Hackensack river; and as the complainants are informed and believe, they intend to proceed and complete the bridge across the river on the located route, and to use the same, and permit it to be used, for the transportation of passengers and merchandise, as a part of their railroad from Newark to

Hoboken.    It is further charged in the blll, that the large revenue and income which the complainants derive from tolls received at their bridges from the travelling over them between Newark and Hoboken will be much lessened by *such travel* passing over the bridge which the defendants are building, and that they will be greatly injured by the bridge and the erection thereof.    The complainants pray for an injunction to restrain the defendants from erecting or maintaining the said bridge, or any other bridge, across the Hackensack, at any place within the limits specified in the act of 1790, until the 24th of November, 1889.

The defendants admit, in their answer, that they are proceeding to locate and construct a railroad from Hoboken to Newark; and they justify their acts under powers conferred upon them in the statute. of March, 1860, referred to by the complainants, entitled, "A further supplement to an act to incorporate the Hoboken Land and Improvement Company," &c.    The act authorizes and empowers them to survey, lay out, and construct, maintain and operate, a railroad from some point, at or near the Hoboken ferry, to such point or points in the city of Newark as they may deem best calculated to *facilitate the public travel to said ferry;* with power to erect and maintain the necessary viaducts over the Hackensack and Passaic rivers, and to acquire by contract, if the same can be accomplished, or if that cannot be done, then to take and appropriate, use, and exercise so much of all rights, priviliges, franchises, property, and bridges or viaducts, or such parts thereof as may be necessary to enable the company to construct said railroad and branches; first making, or causing to be made, compensation in the following manner, to wit: if they shall fail to agree with the person or persons, corporation or corporations, claiming to own or owning any right, privilege, franchise, or property, for the exercise, use, appropriation, or purchase thereof, or so much thereof as shall be necessary to carry out the

objects of the act, and to construct, maintain, and operate the railroad, its spurs and branches ; or if, from any other cause, no such agreement shall be made, application shall be made in writing by the company to the Chief Justice for the appointment of commissioners to examine into the matter.   The report of the commissioners made in conformity with the act, or in case of an appeal, the verdict of the jury and judgment of the Supreme Court thereon, (the appraisement, assessment, valuation, and damages being first paid or deposited in court) shall at all times be considered as plenary evidence of the right of the company to take, have, hold, use, occupy, possess, exercise, appropriate, and enjoy, so much and such parts of said rights, privileges, franchises, and property so necessary to be taken, appropriated, exercised, or used, and so compensated for.   The defendants also admit that they are driving piles on the eastern shore of the Hackensack river on the located route ; and they aver that they intend to proceed and complete the railroad across the river on the route, and to use it, and permit it to be used, for the transportation of passengers and merchandise over the same, as a part of their railroad from Newark to Hoboken ; but they deny that they intend to use it for any other purpose, or to allow to pass thereon, across the river, any vehicles or carriages, or anything for the conveyance of goods, merchandise, or passengers, which were known or in use in 1790, or at the time the complainants were incorporated ; and they state, that it will be impossible for any vehicle or animal, which can cross upon the bridge of the complainants, to cross the river upon the railroad of the defendants ; and that no foot passenger can cross the same with safety ; and that it is not intended for the passage of foot passengers ; but that it will be so constructed as to have iron rails laid thereon, upon which engines, propelled by steam, with railroad cars, may be moved ; and that it will not be connected with the shore on either side of the river, except by a piece of timber

under each rail; and that the structure must necessarily be made in such manner as to make it impossible for man or beast to cross the river upon the same, except in the railroad cars; and that they intend so to construct it, that no vehicles can cross it except locomotive engines and railroad cars, resting and necessarily running on iron rails, and which cannot move upon the bridge over the Hackensack which the complainants have erected, and also in such manner that no foot passenger can cross the river on their said railroad viaduct.

The defendants admit that the complainants have not given them any consent for the erection of the structure which they have so commenced; and also, that they have not paid or tendered to the complainants any compensation or damages for the pretended violation of any exclusive right or monopoly; but they charge that the complainants have no such franchise, which has been taken or appropriated, or is to be taken or appropriated, that requires the defendants to pay or tender compensation or damages.

The question raised in this part of the case is, whether the defendants are violating any of the complainants' rights, without first obtaining their consent or making compensation, by commencing and continuing to erect, on the located line of their railroad between Newark and Hoboken, the structure or viaduct which is complained of in the bill.

The language of the 15th section of the statute of 1790 declares, that it shall not be lawful for *any person* whatsoever to erect any other bridges over the two rivers within specified distances. This is a prohibition upon the complainants as well as upon other parties. They were only authorized to erect and maintain the bridges then contemplated in the act. They could not have constructed a bridge over either river for the use of the New Jersey Railroad Company or for any other company, nor could they grant a *right* to any person or corporation to erect a

bridge. That power remained in the sovereign people, restrained in its exercise to legislative authorizations only of such structures as will not be impaired by the *franchise* granted in the act of 1790, and now held by the complainants. This restraint upon the legislative power should not be so construed as to secure to the complainants greater immunity in the enjoyment of their franchise and property than is possessed by other parties in the state, or to protect them from the effects of a constitutional exercise of the power of eminent domain.

If the terms of the grant are to be ascertained *only by the words*, a structure over either river in the form of a bridge for sustaining water pipes or for the passage of a canal with a towing path could not be authorized by law. The legislature did not contemplate such a construction of their language. It is inconsistent with the subject they were dealing with, and unnecessary for effecting the special objects of their grant. Seeing, then, that the complainants have not the monopoly of *building* bridges over the two rivers, it becomes important for us to ascertain whether they have the right, under their grant, to adapt their present bridge over the Hackensack river to ordinary railroad travel by laying down iron rails, and providing upon it such other appliances as are necessary for permitting locomotive engines and trains of cars to pass freely and unmolested over the same. Such could not have been within the contemplation of the commissioners who acted in behalf of the legislature, when they required that the bridges should be constructed upon the principles of the bridge over the Charles river, between Boston and Charlestown, and of the width of thirty-two feet. Nor was such construction given to the grant by the legislature in 1832, in a proviso to the 10th section of the act incorporating the New Jersey Railroad and Transportation Company. After empowering that railroad company to purchase the turnpike roads and bridges on their route, they provide for continuing and protecting the use of

them to the public, by enacting that the Newark turnpike and the bridges over the rivers Hackensack, Passaic, and Raritan, and road, shall be preserved without obstruction as public roads as *theretofore*, subject to the provisions of their several charters.

But admitting that the complainants have the *right* to accommodate their bridges to the exigencies of railroad travel, are they required so to do ? Certainly not, unless their *franchise* of taking toll extends to that mode of travelling.

In 6 *Manning & Granger, p.* 229, in the case of *The Portsmouth Bridge Company,* where a question arose as to what was tollable property, Tindall, C. J., said, " Whoever seeks to impose tolls must support his claim by plain words." None of the subjects of toll contained in the rates which are incorporated in the contract made by the commissioners will include a locomotive engine or a train of passenger or freight cars. Each of the travellers inside the cars cannot be rated as a single person, because that item in the rates fixed by the commissioners manifestly was intended for footpassengers ; nor could a tariff be fixed upon the motive power, and the cars and passengers in them, under the concluding clause of " *other articles not enumerated,*" which follows in the section after calves, sheep, and hogs. If, then, we seek to settle the true construction of the clause of exclusion, by applying to it the ordinary rules of interpretation, we find that the context, the subject of the grant and the spirit and reason of the law, leads us to the conclusion that the legislature, in assaying to provide for a pressing public want by securing the erection of bridges upon a great line of highway, also insured to the lessees or proprietors thereof, by granting to them the franchise of toll, all the profits which could be derived from the transit of persons and property across the said rivers, over bridges to be used as ordinary public highways, within the prescribed limits, and by methods then known and understood.

As has already been shown, the *franchise* of the complainants is the privilege of exacting toll for crossing the rivers and bridges. No such franchise is granted to the defendants in their supplement; nor do they, in constructing their railroad, require the appropriation, use, or exercise of this franchise of the complainants, or of any part thereof. When the viaduct shall be completed it will become a part of a continuous line of railroad from Newark to Hoboken, having no greater productive value than so many lineal feet of the track constructed on the salt meadows. The defendants, in their answer say, that it is not to be a passage whereby parties may escape paying toll on the complainants' bridge. Grant that the New Jersey Railroad and Transportation Company, by an agreement with the complainants, were permitted by them, for valuable considerations, to erect their railroad bridges over the rivers Passaic and Hackensack, and that they were induced to negotiate because they supposed that the structure and use of their road and bridges would infringe upon the *franchise* of the complainants, it is a *non sequitur* that the language of the act of 1860 put the defendants even in a doubtful position as to their obligation to compensate.

In 1832, the practical working of railroads was very little known in this country; and from the provisions of the 8th section of the charter of the New Jersey company, it is manifest that the legislature contemplated that wagons, carriages, and other known vehicles with adaptation to railway tracks, would be passed over the road by persons who had been accustomed to use the bridges and road of the complainants. The railroad company are therein authorized to demand tolls and rates for the passage of all carriages upon their railroad, and are directed to cause their rates of tolls to be inscribed or painted on some conspicuous place *at each gate* where toll should be required to be paid. And it is provided, that no *farmer* belonging to the state shall be required to pay any toll for

the transportation of the produce of his farm to market over the railroad in his own carriage, weighing not more than one ton, when the weight of such produce shall not exceed one thousand pounds, but the said *farmer* may be charged toll as for an empty carriage.   It is not difficult for us to suppose that a grave doubt may then have been raised as to the probable direct interference in the use of the railroad with the exclusive franchise of the complainants, and that the railroad company might naturally have supposed that their interest would be promoted by securing the bridge company stock.   But it is clear that, in buying permission to erect bridges and in obtaining the control of the stock in the company, they did not acquire a right to engraft the bridge *franchise* into the charter of their railroad company, so as to claim, by themselves or through the bridge company, that no other *railroad* should be constructed over the rivers within the limits prescribed in the act of 1790 without their permission.

In the supplement, under which the defendants are operating, there is no recognition of a right in any persons but the defendants to place and run cars upon the road which they are building, and to demand fare for the transportation of passengers and merchandise thereon; and no authority is granted to the defendants to charge toll for the passage of carriages of other parties over their road and viaducts.

Seeing, then, that the defendants insist that they do not require in the construction of their railroad, by a viaduct over the river Hackensack, any parts of the rights, privileges, *franchises*, property, bridges, or viaducts of the complainants, there can be no ground for an injunction, unless it is found in the requirement that they shall agree for or condemn rights and franchises *claimed* to be owned by other parties.   The complainants insist that the reservation in their favor, at the close of the first section of the supplement to the defendants' charter, created the exclusive privilege now claimed, if none existed before that

time, and that it contains a legislative recognition of their right to compensation ; and that, by accepting the act, the defendants have debarred themselves from questioning the right, and that they were bound to apply, under their fifth section, for the appointment of commissioners before they could lawfully proceed to construct their viaduct. It would be a forced interpretation of the language of the act to say that any claimant of an *imaginary* franchise or right can stop the construction of the railroad until commissioners shall decide upon the existence of the right ; and if determined by them to *be an entity*, then until they shall settle how much of it is required by the defendants, and what compensation shall be paid by them for its exercise, although they set up that they do not wish to appropriate it, or any part of it.

A right must have an existence before any person or corporation can own or claim to own it. If the defendants, in the construction of their railroad, had deemed it necessary to appropriate and exercise any admitted right, privilege, or franchise that the complainants own or claim to own, and an agreement for its use could not be made, it was their duty to apply for the appointment of commissioners ; but if they do not propose to interfere with the existing rights or franchises of any person or corporation, there is nothing for them to negotiate for with the complainants preliminary to applying for a commission ; and hence there would be nothing for commissioners or a jury, in the event of an appeal, to act upon.

This view of the supplement of 1860 will not injuriously affect the complainants in the enjoyment of their *acknowledged or existing rights*. It was argued correctly by their counsel, that if they should waive the invocation of legal means to protect their franchise, either by giving their consent in writing to its infringement or by waiving a bill to enjoin, they would not thereby waive their right of compensation. By parity of reasoning, if as the work of construction progresses, or after its completion, it shall

appear that the defendants have interfered with or appropriated any right, privilege, or franchise of the complainants, an action for compensation in damages can be instituted and maintained, and an injunction can be applied for to restrain them from continuing the unlawful appropriation of the complainants' privileges.

But can it be successfully argued that, in 1860, the legislature intended to confer *new privileges* upon the complainants? If such was their design, it could have been expressed in clear and positive terms.

Public grants in derogation of public rights, abridging the exercise of governmental powers and duties, are construed most strictly against the grantees, and nothing should be taken by implication against the state. It seems clear to me that the complainants must in this case rely for compensation upon their rights as they existed before the law of 1860 was passed.

Inasmuch as the prohibition of any other bridges within specified distances, on each river, was introduced into the act of 1790 to protect the proprietors of the two bridges in the enjoyment of their *franchise* of demanding and receiving tolls; and as the viaduct or bridge which the defendants are constructing is not intended either for a toll bridge or a free bridge; and as the defendants design to make the structure complained of a part of the continuous line of railroad from Hoboken to Newark to be adapted to no modes of transit except by the use of railroad cars and locomotive engines, the legislative authority given to the respondents to construct a railroad with viaducts over the rivers cannot be held to be a violation of the contract existing between the state and the grantees from their commissioners or in *fraud of that grant.*

Suppose that the restriction in the act of 1790 had been, that it should not be lawful for any person or persons whatsoever to erect or cause to be erected any free bridge or any other toll bridge over or across either of the rivers within the distances specified, would the structure which

the defendants contemplate to erect over the river Hackensack come within the interdiction, either by the words or the spirit of the protection? If not, how can it be held to be a violation of the franchise, which is protected by the exclusion of *any other* bridge or bridges, or the law which authorizes it be a fraud upon that grant? Can the language employed in the 15th section receive a broader construction than the prohibition of all free bridges and all toll bridges would? The answer shows that the viaduct complained of will be neither of those structures.

Although the cases examined by the Chancellor, and again cited on the argument before this court, may not be entitled to the weight of express authorities, still they show that the inclination of the courts wherein they arose was clearly in favor of the view, which I have enunciated, of the extent of franchises of like character.

In the case of *The Utica and Schenectady Railroad Company*, reported in 6 *Paige* 554, Chancellor Walworth said, " if the grant had in terms given to the corporation the exclusive right of erecting a toll bridge across the river at Schenectady, this subsequent grant to the railroad company to cross the river with their railroad from Schenectady to Utica, and to transport passengers thereon in the ordinary course of their business in the conveyance of travellers from one place to another, would not have been an infringement of the privileges conferred by such prior grant, as a railroad bridge would not be a toll bridge within the intent and meaning of the first grant.

The Supreme Court of North Carolina, in the case of *McRae* v. *The Wilmington and Raleigh Railroad Co.*, 2 *Jones* 186, held that a law authorizing the extension of a railroad across the northeast branch of Cape Fear river was not a violation of the franchise granted to an individual of building and maintaining a bridge over the river, and taking tolls thereon, although the grant provides that it should not be lawful for any person whatever to build any

3 A*

bridge over the said river. Other cases are to the same effect.

The adjudication in the case of *The Enfield Toll Bridge Company* v. *The Hartford and New Haven Railroad Co.*, reported in 17 *Connecticut*, was relied on by the complainants as abundantly sustaining a contrary doctrine. The first argument of the case took place before the Supreme Court of Errors of the state of Connecticut, composed of the Chief Justice and four associate judges. In the opinion delivered, the Chief Justice took the broad ground, that a prohibition in the law establishing the Enfield Bridge Company, similar to that contained in our act of 1790, was sufficient to prevent the railroad company from erecting a bridge within the prescribed limits, to be used for the sole and exclusive accommodation of the travel on a railroad.

In examining the question, the learned Chief Justice argued that it is not the name "*bridge*," which is sufficient to designate the structure, but its object and intent should be considered. At the close of the report of the case, it is said, that the other judges *ultimately* concurred in the opinion, though Judge Hinman, at first, thought that the structure of the defendants was not "a bridge" within the meaning of the plaintiffs' charter. After this decision was made, and the Supreme Court were advised to grant an injunction, the plaintiffs' damages were duly assessed, by commissioners, at $350, and the money was tendered to and refused by them.

The case subsequently, in the following year, 1846, came again before the same court, the plaintiffs then insisting that their rights extended beyond the bridge franchise, and that they had a contract with the state which had been impaired by legislation.

After full arguments were made, Judge Church read an opinion, which was fully concurred in by Judges White and Hinman. They held that the property and franchises of the bridge company, and the charter which created

them, are essentially the same, and were both subject to the exercise of the power of eminent domain equally with the property of the private citizens of the state. They also held, that as all powers, privileges, and immunities necessary to carry into effect the purposes and objects of their charter were given to the railroad company, including in terms an authority to erect a bridge, if necessary, across the Connecticut river for the sole accommodation of the travel on the railroad, that they had a right (subject to making compensation for any franchise they might impair) to construct their railroad over the river within the protected limits, although the 19th section of the charter of the Hartford and Springfield Railroad Company, which was extended to the charter of the defendants, provides " that nothing therein contained shall be construed to prejudice or impair any of the rights now vested in the Enfield Bridge Company." The Chief Justice and Judge Storrs dissented as to the construction of the 19th section, and held that it was intended, in connection with the other provisions of the charter, to guard against any interference with the rights of the bridge company within the protected limits.

I have cited from the case thus fully for the purpose of showing that the learned Chief Justice held very rigid notions upon the subject of old grants to corporations, and was led to consider them as more sacred and inviolable than the private property and rights of individuals.

After carefully considering that case, I am not convinced that the reasoning of the Chief Justice, in his written opinion, or the conclusions which he reached, should influence our decision.

The charter of the Boston and Lowell railroad corporation, which was adjudicated on in the case cited from 2 *Gray's Reports*, presented a different question. The act was passed in 1830, and contemplating that the railroad would be used by the public with their own vehicles, the legislature provided for the erection of toll houses, the

establishment of gates, and the appointment of toll gatherers.

In the 12th section, it is provided, that no other railroad than the one thereby granted should, within thirty years from and after the passing of the act, be authorized to be made, leading from Boston, Charlestown, or Cambridge to Lowell, or from either of those three places, to any place within five miles of the northern termination of the road thereby authorized to be made.

The adjudication of the case established that the stipulation in their charter, that no other railroad within a limited time should be authorized to be built, was a part of the right of the Boston and Lowell railroad corporation, which could not be invaded except by the legislature, in their exercise of the right of eminent domain; and that a combination by three distinct railroad companies subsequently chartered for other purposes, so that they formed a continuous railroad line from Lowell to Boston, was an infringement of the exclusive right, and furnished a proper case for an injunction. This case is no authority upon the question as presented in the case now before this court.

My opinion is clear that the Chancellor took the correct view of the case, and that his decree dismissing the bill of complaint should be affirmed.

The decree of the Chancellor was affirmed by the following vote:

*For affirmance*—Judges COMBS, CLAWSON, HAINES, OGDEN, SWAIN, VREDENBURGH.

*For reversal*—Judges CORNELISON, VAN DYKE.